## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| STACY ROBERTS, Derivatively on Behalf of Nominal Defendant MICRON TECHNOLOGY, INC., | Case No. |
| Plaintiff, | **JURY TRIAL DEMANDED** |
| v. | |
| SANJAY MEHROTRA, MARK MURPHY, LYNN A. DUGLE, RICHARD M. BEYER, STEVE GOMO, LINNIE HAYNESWORTH, MARY PAT MCCARTHY, BOB SWAN, and MARYANN WRIGHT, | |
| Defendants, | |
| and | |
| MICRON TECHNOLOGY, INC., | |
| Nominal Defendant. | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

By and through his undersigned counsel, Plaintiff Stacy Roberts ("Plaintiff") brings this shareholder derivative action on behalf of Nominal Defendant Micron Technology, Inc. ("Micron" or the "Company") and against certain current and former officers and directors of the Company for (i) violations of Sections 14(a), 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder; (ii) breaches of fiduciary duty; (iii) unjust enrichment; (iv) abuse of control; (v) gross mismanagement; (vi) waste of corporate assets; and (vii) breach of fiduciary duty for insider selling and misappropriation of information. Plaintiff makes these allegations upon personal knowledge as to those allegations concerning himself and, as to all other matters, upon the investigation of

counsel, which includes without limitation: (a) review and analysis of public filings made by Micron and other related parties with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of press releases and other publications disseminated by certain of the Defendants (defined below) and other related non-parties; (c) review of news articles, shareholder communications, and postings on Micron's website concerning the Company's public statements; (d) pleadings, papers, and any documents filed with, and publicly available from, the related consolidated securities fraud class action lawsuit captioned *In re: Micron Technology, Inc. Securities Litigation*, Case No. 25-cv-00191-BLW (D. Id.) (the "Related Securities Action"); and (f) review of other publicly-available information concerning Micron and the Defendants.

## NATURE OF THE ACTION

1.     Plaintiff brings this action derivatively for the benefit of Nominal Defendant Micron against certain of the Company's current and former executive officers and directors aiming to rectify the Defendants' breaches of fiduciary duties for issuing false and misleading statements and/or omitting material information in the Company's public filings and proxy statements from approximately March 29, 2023, to the present (the "Relevant Period").[1]

2.     Micron, a memory chip manufacturer, had for years cultivated a reputation as the foremost forecaster of global supply and demand dynamics within the semiconductor industry. However, the Company suddenly began making optimistic pronouncements regarding those supply and demand dynamics at the same time that its Chief Executive Officer ("CEO") entered into a plan to sell massive amounts of stock.

---

[1] The materially misleading statements and/or omissions were issued in the Company's financial reports and other public filings and releases from approximately March 29, 2023 to December 18, 2024; however, the wrongs complained of herein continue through to the present as the Company's internal controls remain deficient.

3.     Only after the stock sales were completed did the Company reveal previously undisclosed supply and demand headwinds, including weaker than expected consumer and enterprise demand, and increased competition from Yangtsee Memory Technologies Corp ("YMTC"). However, Defendants had previously assured investors that they had been closely tracking customer demand and were aware of the competitive threat from YMTC.

4.     The Company designs, develops, manufactures, and sells memory and storage products, falling into two main categories, dynamic random access memory ("DRAM") and NAND flash memory ("NAND"). DRAM and NAND products are the two most common semiconductor chips readily available in the market.

5.     Micron's memory and storage products are sold in multiple markets, with sales reported across various business units. These markets include those for consumer technologies such as personal computers ("PCs"), smartphones, tablets, and cameras, as well as for commercial and industrial applications, such as in manufacturing environments and data centers. Examples of memory and storage products for consumers include, *inter alia*, NAND flash memory devices, such as solid-state drive ("SSD") cards and flash drives.

6.     As the Company has noted in its public filings, "[t]he memory and storage industry environment deteriorated sharply in the fourth quarter of 2022 and throughout 2023 due to weak demand in many end markets combined with global and macroeconomic challenges and lower demand resulting from customer actions to reduce inventory levels[,]" which "led to significant reductions in average selling prices for both DRAM and NAND and bit shipments for DRAM, resulting in declines in revenue across all [of Micron's] business segments and nearly all [of its] end markets." However, in order to prop up the Company's share price, throughout the Relevant Period Defendants repeatedly assured investors that demand for Micron's products,

including its consumer-oriented and NAND products, was recovering and that supply was coming into line with industrywide demand, and assured investors that the Company was on track for record revenues in its fiscal year 2025. Micron also reassured investors that in making its statements about supply and demand, it had considered the pressures faced by its competitors, including from state-backed Chinese competitors such as YMTC.

7.      These assurances resulted in the skyrocketing of Micron's share price. On March 28, 2023, the first day of the Relevant Period, Micron's share price was $59.28 per share. As a result of Defendants' misrepresentations, the Company's share price exploded to $153.45 on June 18, 2024, an increase of 158.9%. While the share price fell over the ensuing months, on December 18, 2024, the day investors learned (after trading had closed) that Defendants had been misrepresenting Micron's business and prospects, the Company's share price closed at 103.90, up 75.3% from the start of the Relevant Period.

8.      Throughout the Relevant Period, Defendants continued to make materially false and misleading statements regarding global supply and demand dynamics that failed disclose that its description of supply and demand ignored factors known or knowable to Micron, including weakness in customer demand and the competitive threat posed by YMTC, and that as a result, its description of the supply and demand environment was materially misleading.

9.      With the shares of the Company pumped as a result of Defendants encouraging statements regarding customer demand, Defendant Mehrotra began the "dump" phase of his scheme and entered into a 10b5-1 trading plan that caused Mehrotra to sell 799,284 shares of stock for total proceeds of $77,471,537.52 before the promised record year of 2025. This unprecedented selling spree was far out of character for Mehrotra. In the comparable timeframe

preceding the Relevant Period, he only sold 100,000 shares for proceeds of $971,600. In other words, Mehrotra's Relevant Period sales eclipsed his prior history by more than 7,873.6%.

10.    On December 18, 2024, Micron issued a press release announcing its financial results for the first quarter of its fiscal year 2025.1 Among other items, the Company reported a greater-than-expected revenue decline in NAND flash memory for the quarter. Micron also issued disappointing guidance for the second quarter of its fiscal year 2025, including adjusted earnings between $1.33 and $1.53 per share, well below the $1.92 per share estimate; sales between $7.7 billion and $8.1 billion, with the midpoint well below the $8.99 billion estimate; and adjusted gross margins between 37.5% and 39.5%, well below the 41.3% estimate; citing weakness in the Company's consumer-oriented markets. Defendants attributed these disappointing results to factors that were all known to Micron, including customer demand levels, and competition posed by YMTC.

11.    Micron did not write down the value of inventory, its inventories did not increase, and the ratios it used to apprise investors of its inventory management status improved over the final months of the Relevant Period. This stood in stark contrast to what the Company experienced the last time it was surprised by a downturn, during its 2023 fiscal year, when Micron's inventory management ratios worsened dramatically, its inventories skyrocketed, and the Company was forced to write off $1.83 billion inventory. According to Arcady Zaydenverg, a forensic accounting expert retained by Plaintiffs, "Micron's inventory levels and ratios from the end of fiscal 2024 (*i.e.*, August 29, 2024) through the end of the first quarter of fiscal 2025 (*i.e.*, November 28, 2024), are not consistent with the expectation of a significant rise in revenue in the immediate future." In other words, the data shows that Micron was acting as if it was expecting a demand slowdown, not that it was surprised by a demand slowdown.

12.     The next day, multiple analysts lowered their price targets for Micron stock, citing the Company's disappointing guidance for the second quarter of its fiscal year 2025, while noting significant weakness in demand in its consumer markets, especially for its NAND products. Following these developments, Micron's stock price fell $16.81 per share, or 16.18%, to close at $87.09 per share on December 19, 2024. This represented a stunning decline of 43.2% from the Company's share price high of $153.45 on June 18, 2024.

13.     The disclosures in the 1Q25 Earnings Release both corrected the market's misimpression Micron's business operations, which had been inflated by Defendants' misrepresentations, and constituted a materialization of the concealed risk that when the market learned the truth about the Company's prospects, the stock price would plummet.

14.     While investors sustained massive losses as a result of this decline, Mehrotra reaped windfall profits by selling 799,284 shares of Micron stock during for proceeds of $77,471,537.52 during the Relevant Period, including 37,000 on June 11, 2024 for $5,141,890 in proceeds just before the Company's share price reached its peak, and another 34,284 shares on June 18, 2024, for $5,220,767.52 in proceeds as the stock peaked.

15.     As a result of Defendants' wrongful acts and omissions, the Company and its shareholders have suffered significant losses and damages.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over this action pursuant to the subject matter of this action pursuant to 28 U.S.C. § 1331 because the claims arise under and pursuant to §10(b) of the Exchange Act and Rule 10(b)-5 promulgated thereunder.

17.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367(a), as they relate to Plaintiff's claims under 15 U.S.C. §78n(a).

18.     Venue is proper in this Court because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and Defendants have received substantial compensation within this district by doing business here and engaging in numerous activities that had an effect in this jurisdiction.

19.     Furthermore, venue is proper in this Court pursuant to the Company's Restated Bylaws, which state:

> (a) Unless the corporation consents in writing to the selection of an alternative forum, the Court of Chancery of the State of Delaware (or, if the Court of Chancery of the State of Delaware does not have jurisdiction, another State court in Delaware **or the federal district court for the District of Delaware**) shall, to the fullest extent permitted by law, **be the sole and exclusive forum for (i) any derivative action or proceeding brought on behalf of the corporation**, (ii) any action asserting a claim of breach of a fiduciary duty owed by any director, stockholder, officer or other employee of the corporation to the corporation or the corporation's stockholders, (iii) any action arising pursuant to any provision of the DGCL or the Certificate of Incorporation or these Bylaws (as either may be amended from time to time) or (iv) any action asserting a claim governed by the internal affairs doctrine, except for, as to each of (i) through (iv) above, any complaint as to which such court determines that there is an indispensable party not subject to the jurisdiction of such court (and the indispensable party does not consent to the personal jurisdiction of such court within 10 days following such determination).[2]

## PARTIES

### A.     Plaintiff

20.     Plaintiff was a shareholder during the Relevant Period, is currently, and has continuously been, a holder of Micron common stock.

### B.     Nominal Defendant

---

[2] Available at https://www.sec.gov/Archives/edgar/data/723125/000110465925069019/tm25211 53d1_ex3-1.htm.

21.    Nominal Defendant Micron is incorporated in Delaware and its current principal executive offices are located at 2929 Walnut Street, Philadelphia, Pennsylvania 19104. The Company's common stock trades on the NASDAQ under the ticker symbol "MU."

**C.    Defendants**

22.    Defendant Sanjay Mehrotra ("Mehrotra") has been the Company's CEO, President, and member of the Board of Directors (the "Board") since June 2017. Defendant Mehrotra has been the Chair of the Board since January 16, 2024. Defendant Mehrotra is a member of the Board's Finance Committee. Defendant Mehrotra is named as a defendant in the Related Securities Action.

23.    Defendant Mark Murphy ("Murphy") has been the Company's Executive Vice President and Chief Financial Officer ("CFO") at all relevant times. Defendant Murphy is named as a defendant in the Related Securities Action.

24.    Defendants Mehrotra and Murphy are referred to collectively herein as the "Securities Action Defendants."

25.    Defendant Lynn A. Dugle ("Dugle") has been a member of the Company's Board since 2020. Defendant Dugle is a member of the Board's Governance and Sustainability Committee and the Security Committee.

26.    Richard M. Beyer ("Beyer") has been a member of the Company's Board since 2013. Defendant Beyer is the Chair of the Board's Compensation Committee and a member of the Governance and Sustainability Committee and the Security Committee.

27.    Defendant Steve Gomo ("Gomo") has been a member of the Company's Board since 2018. Defendant Gomo is a member of the Board's Audit Committee and Security Committee.

28.     Defendant Linnie Haynesworth ("Haynesworth") has been a member of the Company's Board since 2021. Defendant Haynesworth is a member of the Board's Audit Committee and Finance Committee.

29.     Defendant Mary Pat McCarthy ("McCarthy") has been a member of the Company's Board since 2018. Defendant McCarthy is the Chair of the Board's Audit Committee and a member of the Finance Committee.

30.     Defendant Bob Swan ("Swan") has been a member of the Company's Board since March 2024. Defendant Swan is a member of the Board's Audit Committee and Finance Committee.

31.     Defendant MaryAnn Wright ("Wright") has been a member of the Company's Board since 2019. Defendant Wright is a member of the Board's Compensation Committee and the Chair of the Governance and Sustainability Committee.

32.     Defendants Mehrotra, Dugle, Beyer, Gomo, Haynesworth, McCarthy, Swan, and Wright are collectively referred to herein as the "Director Defendants."

33.     The Securities Action Defendants, along with the Director Defendants, are collectively referred to herein as the "Individual Defendants."

34.     The Individual Defendants, along with Micron, are referred to herein as the "Defendants."

**D.     Related Party Non-Defendants**

35.     Related Party Non-Defendant Christie Simons ("Simons") has served on the Company's Board since 2025. Simons is named solely for the purpose of demand futility.

36.     Related Party Non-Defendant Mark Liu ("Liu") has served on the Company's Board since 2025. Liu is named solely for the purpose of demand futility.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

37.     By reason of their positions as officers, directors, and/or fiduciaries of Micron, and because of their ability to control the business and corporate affairs of Micron, the Individual Defendants owed, and owe, the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were, and are, required to use their utmost ability to control and manage Micron in a fair, just, honest, and equitable manner. The Individual Defendants were, and are, required to act in furtherance of the best interests of Micron and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

38.     Each director and officer of the Company owes to Micron and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, as well as the highest obligations of fair dealing.

39.     In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's financial and business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

### Duties of the Members of the Audit Committee

40.     Pursuant to the Audit Committee Charter of Micron (amended as of July 17, 2025),[3] the purpose of the Audit Committee is to:

> **1.01. Oversight and Monitoring**. Assist the Board in overseeing and monitoring (a) the integrity of the Company's financial statements including the accounting and financial reporting processes and audits of the financial statements, (b) the

---

[3] Available at https://www.micron.com/about/sustainability/corporate-governance/micron-audit-committee.

Company's compliance with legal and regulatory requirements, (c) the independent auditor's qualifications and independence, and (d) the performance of the Company's internal audit function and of its independent auditors; and

**1.02. Reporting**. Prepare the report required by the Securities and Exchange Commission (the "SEC") to be included in the Company's annual proxy statement.

41.    The Audit Committee Charter sets forth the following duties, among others:

## 4. Duties and Responsibilities

In order to carry out the purpose described above, the Audit Committee shall undertake those specific duties and responsibilities listed below and such other duties as the Board may from time to time prescribe.

**4.01. Delegation of Board Authority to Committee**. In addition to the duties and responsibilities set forth in this charter, the Board may periodically authorize the Audit Committee to have a level of approval authority for all or certain activities within the scope of the Audit Committee's duties set forth in this Charter and with respect to such activities the Audit Committee shall have the same powers and rights as the Board to authorize and approve such activities up to such level of approval authority. With respect to activities exceeding any such level of approval authority of the Audit Committee, the Audit Committee shall submit for approval recommendations to the Board.

**4.02. Authority to Engage Advisors and Funding**. The Audit Committee shall have the authority to engage independent counsel and other advisors, as it deems necessary to carry out its duties. The Company shall provide for appropriate funding, as determined by the Audit Committee, in its capacity as a committee of the Board, for payment of: (a) compensation to any registered public accounting firm engaged for the purposes of preparing or issuing an audit report or performing other audit, review or attest services; (b) compensation to any advisors employed by the Audit Committee pursuant to this Section 4.02, and (c) ordinary administrative expenses of the Audit Committee that are necessary or appropriate in carrying out its duties.

**4.03. Access**. The Audit Committee shall enjoy access to the Company's officers, employees, books, records and facilities as may be appropriate or necessary to carry out its responsibilities, subject to reasonable advance notice to the Company and reasonable efforts to avoid disruption to the Company's management, business and operations. To avoid disruption, such requests for access shall be coordinated through the Audit Committee Chair.

**4.04. Financial Reporting—Discussions, Reviews and Approvals**.

11

4.04.01 The Audit Committee shall review and discuss with management and the independent auditors the annual audited financial statements and quarterly unaudited financial statements, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," prior to filing with the SEC the Company's Annual Report on Form 10-K and Quarterly Reports on Form 10-Q, respectively, and recommend to the Board whether the audited financial statements should be included in the Form 10-K.

4.04.02 The Audit Committee shall discuss with management and the independent auditor significant financial reporting issues and judgments made in connection with the preparation of the Company's annual and quarterly financial statements, including any (a) significant changes in the Company's selection or application of accounting principles, (b) major issues as to the adequacy of the Company's internal controls, and (c) special steps adopted by the Company in light of identified material control deficiencies.

4.04.03 The Audit Committee shall discuss with management the Company's earnings press releases, including the use of "pro forma" or "adjusted" non-GAAP information, as well as financial information and earnings guidance. Such discussion may be done generally (consisting of discussing the types of information to be disclosed and the types of presentations to be made).

4.04.04 The Audit Committee shall review annually, prior to the completion of the independent auditor's annual audit of the Company's year-end financial statements (the "Annual Audit"), the independent auditor's report that describes (a) the critical accounting policies and practices to be used in the Annual Audit, (b) all alternative treatments of financial information within generally accepted accounting principles that have been discussed with management, ramifications of the use of such alternative disclosures and treatments on the Company's financial statements, and the treatment preferred by the independent auditor, (c) critical audit matters identified by the independent auditor, if any, and (d) other material written communications between the independent auditor and management. Review annually any reports on such topics or similar topics prepared by management.

4.04.05 The Audit Committee shall discuss with the independent auditor any material issues raised in the report referred to in Section 4.04.04.

4.04.06 The Audit Committee shall review any quarterly report addressed to management prepared by the independent auditor and any quarterly reports with an "ineffective" audit rating addressed to management prepared by the independent auditors or internal auditors and any responses thereto.

4.04.07 The Audit Committee shall review and discuss with management and the independent auditors the Company's Annual and Quarterly Reports on Form 10-K

and Form 10-Q and shall approve such annual and quarterly reports prior to the filing of the report with the SEC.

*      *      *

**4.06. Financial Reporting Process.**

4.06.01 Annually.

4.06.01.01 The Audit Committee shall at least annually, obtain and review the independent auditor's report describing: (a) the audit firm's internal quality-control procedures; (b) any material issues raised by the most recent internal quality-control review, or peer review, of the audit firm or by any inquiry or investigation by governmental or professional authorities, within the preceding five years, respecting one or more independent audits carried out by the firm, and any steps taken to deal with any such issues; and (c) all relationships between the independent auditor and the Company.

4.06.01.02 The Audit Committee shall at least annually, assess the qualifications, performance and independence of the independent auditor, including the lead partner, based on the report referred to immediately above and the opinions of management and of the internal auditors. The Audit Committee shall actively engage in a dialogue with the independent auditor with respect to any disclosed relationships or services that may impact the objectivity and independence of the auditor. The Audit Committee shall take appropriate action to satisfy itself of the independence of the auditor, including whether the provision of non-audit services by the independent auditor is compatible with the auditor's independence. The Audit Committee shall present its conclusion regarding the independence of the outside auditor to the Board at least annually.

4.06.01.03 The Audit Committee shall review with the independent auditors any audit problems or difficulties encountered in the course of the audit work, including any restrictions placed on the scope of the independent auditors' activities or on access to information or personnel, and the adequacy of management's response (including resolutions of disagreements between management and the auditor regarding financial reporting). This review shall also include a discussion of the Company's internal audit function.

4.06.01.04 The Audit Committee shall discuss with the Company's independent auditors the matters required to be discussed by the applicable requirements of the Public Company Accounting Oversight Board and the SEC.

4.06.02 Quarterly.

4.06.02.01 The Audit Committee shall direct the Company's independent auditors to review, before being filed with the SEC, the Company's interim financial

statements included in Quarterly Reports on Form 10-Q, using professional standards and procedures for conducting such reviews.

4.06.02.02 The Audit Committee shall review and discuss with management, the internal auditors, if applicable, and the independent auditor the adequacy and effectiveness of the Company's internal controls, including any changes, significant deficiencies or material weaknesses in those controls reported by the independent auditor, the internal auditors, if applicable, or management and any special audit steps adopted or changes required in light of any material control deficiencies, the reports and certifications regarding internal control over financial reporting and any fraud, whether or not material, that involves management or other Company employees who have a significant role in the Company's internal controls.

4.06.02.03 The Audit Committee shall review at least quarterly the adequacy of the Company's system of internal control over financial reporting, including meeting periodically with the Company's management, internal auditors (or the personnel responsible for the internal audit function) and the independent auditors.

4.06.02.04 The Audit Committee shall review and discuss the adequacy and effectiveness of the Company's disclosure controls and procedures and the reports and certifications over disclosure controls and procedures.

**4.07. Compliance/General.**

4.07.01 The Audit Committee shall review periodically, with the Company's Chief Legal Officer or his or her designee, the Company's compliance with material legal and regulatory requirements. The Audit Committee will also discuss periodically with the Chief Compliance Officer or his or her designee legal matters that may have a significant impact on the Company's financial statements.

4.07.02 The Chief Compliance Officer and/or his or her designee shall, no less than annually, report to the Audit Committee on the implementation and effectiveness of the compliance and ethics program.

4.07.03 The Chief Compliance Officer and/or his or her designee shall have express authority to report personally to the Audit Committee on any matter involving criminal conduct or potential criminal conduct.

4.07.04 The Audit Committee shall meet separately, and periodically, with management and the independent auditor.

4.07.05 The Audit Committee shall review guidelines and policies with respect to risk assessment including enterprise risk management and the steps management

has taken to identify, assess, prioritize, monitor and mitigate such risks. This review shall include a discussion of exposure to major financial risks (except for the use of hedges, derivative instruments and similar risk management techniques, which the Finance Committee has responsibility for reviewing) and major operational risks (except for enterprise cybersecurity, information technology and data protection risks associated with the Company's products, services, information technology infrastructure and related operations and any other risks specifically delegated for oversight by the Security Committee). Notwithstanding the foregoing, it is management's responsibility to assess and manage the Company's exposure to these risks, and it is the Audit Committee's responsibility is to discuss the guidelines and policies by which risk assessment and management is undertaken.

4.07.06 The Audit Committee shall review and discuss with management and the internal audit function the controls, procedures and processes that the Company has in place to ensure the accuracy of its material disclosures and reporting relating to sustainability matters.

4.07.07 The Audit Committee shall set clear hiring policies with respect to employees or former employees of the independent auditors.

4.07.08 The Audit Committee shall establish and oversee procedures for: (a) the receipt, retention, and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters; and (b) the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters.

4.07.09 The Audit Committee shall oversee compliance with the SEC requirements for disclosure of auditor's services, fees, Audit Committee member qualifications and activities.

4.07.10 The Audit Committee shall review the Company's tax positions and strategies.

4.07.11 The Audit Committee shall (i) review and oversee all transactions between the Company and a related person (as defined in Item 404 of Regulation S-K) for which review or oversight is required by applicable law or that are required to be disclosed in the Company's financial statements or SEC filings and (ii) develop and maintain policies and procedures for the Audit Committee's review, approval and/or ratification of such transactions.

4.07.12 The Audit Committee shall submit for approval recommendations to the Board with respect to any activities within the scope of the Audit Committee's duties set forth in this Charter that require approval of the Board.

4.07.13 The Audit Committee shall carry out such other activities within the scope of the Audit Committee's purpose or as the Board may from time to time delegate to it.

*        *        *

**4.10. Reports**.

4.10.01 The Audit Committee shall report regularly to the Board regarding the Audit Committee's activities, examinations and recommendations, as may be appropriate and as are consistent with this Charter.

4.10.02 The Audit Committee shall report at least annually to the Board the Audit Committee's conclusions as to the independent auditors.

4.10.03 The Audit Committee shall be responsible for preparing the report required by the rules and regulations of the SEC to be included in the proxy statement for the annual meeting of stockholders.

**4.11. Authority to Delegate to Subcommittee**. The Audit Committee shall have authority to delegate any of its responsibilities to a subcommittee or subcommittees as it may deem appropriate in its judgment. The subcommittee(s) shall be subject to this Charter.

42.     Under information and belief, the Company maintained versions of the Audit Committee Charter during the Relevant Period that imposed the same, or substantially and materially the same or similar, duties on, among others, the Individual Defendants, as those set forth above.

**Duties Pursuant to the Company's Code of Business Conduct and Ethics**

43.     The Individual Defendants, as officers and/or directors of Micron, were also bound by the Company's Code of Business Conduct and Ethics (the "Code")[4] which, according to the Code, sets out basic principles to guide all directors, officers, and employees of Micron,

---

[4] Available at https://assets.micron.com/adobe/assets/urn:aaid:aem:9cd5d99d-69bd-4fb6-aa6b-baf95357002a/renditions/original/as/integrity-matters-the-micron-code-of-business-conduct-and-ethics.pdf.

who are required to know and conduct themselves in accordance with the Code, as well as applicable laws and regulations, and to avoid the appearance of improper behavior.

44.    Concerning Micron's commitment to ethics, the Code states:

Acting ethically means that we must uphold our responsibility to follow all laws and regulations that apply to the work we do and to our location. We never violate any law — no matter how small. However, the standards we set for ourselves are higher than just following the law. We want to make the ethical choice in every situation. Good judgment can often point to the right course of action — but if there's ever a case when you aren't sure, don't hesitate to ask.

This Code of Business Conduct and Ethics represents our commitment to doing what is right. By being a part of the Micron team, you agree to uphold this commitment. You must understand the standards of our Code, our policies and the laws that apply to your position or function — and you must always follow them. Team members who do not follow these standards put themselves, their co-workers and Micron at risk. Anyone who violates the Code may also be subject to disciplinary action, up to and including termination, as well as criminal prosecution where the circumstances warrant.

This Code applies to everyone who works on Micron's behalf worldwide, including team members (employees, officers and directors) and temporary workers. We are all expected to adhere to the standards contained in this Code. All third parties (such as vendors, suppliers, contractors, distributors and sales representatives) we work with should also follow the standards outlined in this Code or their organization's own code of conduct and policies, if those principles are substantially similar. We should consult our Code for guidance if the right course of action is ever unclear.

45.    Concerning insider trading, the code states:

While working on behalf of Micron, you may become aware of material, nonpublic information about our Company, our owners, our customers or other companies. Material, nonpublic information (also known as inside information) is information about a company that is not known to the general public and that could influence a typical investor's decision to buy, sell or hold that company's securities. Information is no longer nonpublic when it has been widely disseminated to the public and a reasonable waiting period has passed so that the information has been absorbed by the marketplace.

*        *        *

Inside information can also relate to another company, a supplier or a customer that you obtained confidentially during the course of your work.

17

Trading on material, nonpublic information violates insider trading laws. Anyone involved in insider trading could be subject to disciplinary action, as well as potential civil or criminal penalties. It is also illegal to provide inside information to others (or tip them) to influence their investment decisions.

Insider trading is taken very seriously. You may face penalties for misusing inside information even if the amount of money involved was small — or even if you made no profit at all.

46.    Concerning the integrity of the Company's financial books and records, the Code

states:

We all play a role in ensuring the integrity of our financial books, records and disclosures. Whatever information you record for our Company — from hours worked to product inventory, travel expenses, tax records or accounting — you must help ensure that the business information we report is accurate, complete and timely.

*       *       *

The information we record helps our Company plan for the future. It also informs the financial data we report to shareholders and regulators. To make sure our Company can plan correctly and that our shareholders and regulators (including taxing authorities) have accurate information, our books and records — whether paper or electronic — must always be complete and honest. They must fairly reflect our business assets, liabilities, expenses and revenue. We all have a duty to maintain our books and records in accordance with U.S. Generally Accepted Accounting Principles (GAAP) and any other regulatory requirements that apply to a multinational, publicly traded company. We also have a duty not to perform, and not to facilitate others in performing, any act of fraud or tax evasion.

47.    Concerning the proper management of records, the Code states:

In addition to creating honest, accurate financial records, we must also manage and retain our Company's records according to our Records Retention Policy. Records are vital to fulfilling our business needs and meeting regulatory requirements. Never destroy them in violation of the policy.

If certain documents or records may be needed for an investigation, audit or potential lawsuit, they may be placed under a legal hold. If a record is subject to a legal hold, we must not alter, damage or destroy the record until we are instructed that the hold has been lifted — regardless of our usual retention schedules.

We are also firmly committed to preventing and detecting any act of fraud. Generally speaking, fraud is intentionally concealing facts to deceive or mislead others. Among other things, this may include:

- Misstatements due to fraudulent financial reporting or revenue recognition
- Misstatements related to using assets for illegal, inappropriate or unintended purposes (such as wire fraud or fictitious vendors)
- Fraudulently obtained revenue and assets
- Attempts to avoid costs and expenses

48.     Upon information and belief, the Company maintained versions of the Code during the Relevant Period that imposed the same, or substantially and materially the same or similar, duties on, among others, the Individual Defendants, as those set forth above.

### Control, Access, and Authority

49.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Micron, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Micron.

50.     Because of their advisory, executive, managerial, and directorial positions with Micron, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of Micron.

51.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Micron and was at all times acting within the course and scope of such agency.

### Reasonable and Prudent Supervision

52.     To discharge their duties, the officers and directors of Micron were required to exercise reasonable and prudent supervision over the management, policies, practices, and

controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of Micron were required to, among other things:

(a) ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) properly and accurately guide shareholders and analysts as to the true financial and business prospects of the Company at any given time, including making accurate statements about the Company's business and financial prospects and internal controls;

(d) remain informed as to how Micron conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

(e) ensure that Micron was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

## BREACHES OF DUTIES

53.     Each Individual Defendant, by virtue of their position as a director and/or officer, owed to Micron and its shareholders the fiduciary duties of loyalty and good faith, and the exercise of due care and diligence in the management and administration of the affairs of Micron, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their

obligations as directors and officers of Micron, the absence of good faith on their part, and a reckless disregard for their duties to Micron and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to Micron.

54.    The Individual Defendants each breached their duties of loyalty and good faith by allowing the Individual Defendants to cause, or by themselves causing, the Company to make false and/or misleading statements that misled shareholders into believing that disclosures related to the Company's financial and business prospects were truthful and accurate when made.

55.    In addition, as a result of the Individual Defendants' illegal actions and course of conduct, the Company is now the subject of the Related Securities Action that alleges violations of the federal securities laws. As a result, Micron has expended, and will continue to expend, significant sums of money to rectify the Individual Defendants' wrongdoing.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

56.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with, and conspired with, one another in furtherance of their wrongdoing. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

57.    During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to mislead shareholders into believing that the Company's business and financial prospects were better than they actually were. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

58.    The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (a) disguise the

Individual Defendants' violations of law, including breaches of fiduciary duties, unjust enrichment, gross mismanagement, and abuse of control; and (b) disguise and misrepresent the Company's actual business and financial prospects.

59.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly, or negligently release improper statements. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

60.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commissions of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of their overall contribution to and furtherance of the wrongdoing.

## SUBSTANTIVE ALLEGATIONS

### Background of the Company

61.    The Company designs, develops, manufactures, and sells memory and storage products, including, inter alia, DRAM and NAND semiconductor devices, which are the two most common semiconductor chips readily available in the market. According to Micron's annual report on Form 10-K for the 2024 fiscal year ("FY2024"), the Company's fiscal year is "the 52 or 53-week period ending on the Thursday closest to August 31." Micron's FY2022, 2023, and 2024 each contained 52 weeks. Micron's FY2023 ended on August 31, 2023, and FY2024 ended on August 29, 2024. Micron develops, fabricates, assembles and tests its DRAM

and NAND chips at its facilities in Taichung and Taoyuan, Taiwan; Singapore; Hiroshima, Japan; and Boise, ID, and Manassas, VA.

62.    Micron's memory and storage products are sold in various markets, with sales reported across multiple of its business units, including the Computer and Networking Business Unit ("CNBU"), Storage Business Unit ("SBU"); Embedded Business Unit ("EBU"), and Mobile Business Unit ("MBU"). According to CW1, CNBU produces DRAM and high bandwidth memory for computers; SBU handles NAND flash memory; EBU produces embedded products for automotive; and MBU produces products for mobile phones.

63.    Micron's DRAM products are a type of computer RAM, *i.e.*, semiconductor chips that store information while a computer is operating and provide that information quickly to a computer's CPU or GPU. DRAM chips are used solely for short-term storage because they use "volatile memory" Volatile memory refers to a computer storage that temporarily holds data this is in use and requires a continuous power supply to maintain its hold of that stored information; if power is turned off or interrupted, the data stored in volatile memory is lost.[5] Micron's DRAM products are used in data center, personal computing, graphics, industrial, and automotive markets.

64.    Conversely, NAND is a type of "flash memory." NAND is "non-volatile" memory in that it is a type of computer storage that retains data even when power is removed. Unlike DRAM chips, which use "volatile memory," NAND chips preserve information for long-

---

[5] *What is Volatile Memory?*, Lenovo.com, https://www.lenovo.com/us/en/glossary/volatile-memory/?orgRef=https%253A%252F%252Fwww.google.com%252F.

term storage and retrieval.[6] NAND is used in solid state drives for data centers, client personal computing, consumer, automotive, and removable storage markets.

65.    According to TrendForce's Department of Semiconductor Research, which is generally recognized as the industry's leading source of information on the semiconductor market and market participants, Micron's top competitors for DRAM semiconductors during the Relevant Period were Samsung, SK Hynix, and Nanya, and its top competitors for NAND semiconductors during the Relevant Period were Samsung, SK Group, Kioxia, and Western Digital.

66.    Micron derives significant revenues from NAND and DRAM sales, which comprised 97.7% of the Company's revenues in FY 2023 and 98.9% of its revenues in FY2024. These revenues consisted of with $4.21 billion in NAND sales in FY2023 and $7.23 billion in NAND sales in FY 2024. Micron had $10.98 billion in DRAM sales in FY 2023 and $17.60 billion in DRAM sales in FY2024. Micron's NAND sales were 27.1% of its total revenues in FY2023 and 28.8% of its revenues in FY 2024. The Company's DRAM sales were 70.6% of its revenues in FY2023 and 70.1% of its revenues in FY2024.

67.    In addition to reporting revenues, Micron also apprises investors of its inventory in multiple ways. Inventories are a key indicator of the Company's health because, as described below, the lead times for production of NAND and DRAM chips are very long. Micron thus runs a risk of not having sufficient inventory to meet demand or, worse, being caught exposed by an unanticipated decline in demand. One such decline, in calendar year 2022, resulted in the Company's writing off $1.83 billion in inventory in its fiscal year 2023. To allow investors to

---

[6] *What is Non-Volatile Memory*, Lenovo.com, https://www.lenovo.com/us/en/glossary/non-volatile-memory/?orgRef=https%253A%252F%252Fwww.google.com%252F&srsltid=AfmBOoqag32d9igtAtsBqXjTBxQTmjzerj9jvS4y4aURSm60weuI8k0y.

assess how well it manages its inventory, Micron reports its cost of goods sold, as well as the dollar value of its inventory ("raw materials," "work in progress," and "finished goods"). This information enables investors to evaluate how well Micron manages its inventory by calculating "inventory turnover ratio"; and "days in inventory" ratio, the two most commonly used inventory ratios.

68.    The inventory turnover ratio measures how often a company sells and replaces its inventory over a specific period. It is a key metric in understanding inventory management because it measures how efficiently a company converts its inventory into revenue. The ratio is calculated by dividing a company's "cost of goods sold" by its "average inventory." A lower or a declining inventory ratio 2.5x, can be a sign of weak sales or excessive inventory, *i.e.*, overstocking. A higher or increasing inventory turnover ratio, on the other hand, can reflect strong sales or insufficient inventory. This ratio is often calculated on a per quarter and annualized basis.

69.    The "days in inventory" ratio is the average number of days it takes for a company to sell off its inventory. Like the inventory turnover ratio, days in inventory is used to determine a company's inventory management and overall efficiency. By calculating the number of days that a company holds onto the inventory before it is able to sell it, the ratio measures the average length of time that a company's cash is locked up in its inventory. Days in inventory is calculated by taking the average inventory, dividing it by costs of goods sold, and multiplying it by a number of days, *e.g.*, 365 days if calculating days in inventory on an annualized basis. A smaller number of days in inventory indicates that a company is more efficiently and frequently selling off its inventory, which means rapid turnover leading to potentially higher profits. A high number of days in inventory can indicate that a company is not properly managing its inventory

or is having trouble selling that inventory. This ratio is often calculated on a per quarter and annualized basis.

70.     According to a confidential witness ("CW1") who gave information during plaintiff's counsel in the Related Securities Action, Micron's "quarterly forecast" and "budgeting" was "extremally detailed." CW1 stated that Micron executives "were constantly tracking as they moved through the quarter [to see] if there were materially significant changes." CW1 stated that the Company uses an accelerated SAP system ("ASAP") for their Enterprise Resource Planning (ERP), uses "Workday" software for forecasting, and a "Power BI" dashboard for performance and plan reporting. "The business units know what big customers are ordering," CW1 said, and "they have close communication with key customers."

71.     CW1 further stated that if there were any declines in sales it would trigger a "frenzy" at Micron. CW1 stated that "[t]here are so many people looking at [sales] . . . So many executive level meetings if sales revenue is not coming in on target." CW1 further stated that "People are meeting multiple times a week to discuss it." According to CW1, these executive-level meetings will consist of upper management, the heads of business units, and the head of sales. CW1 said that in connection with these meetings, "there is lots of data being pulled . . . . They are looking at what levers can be adjusted to meet the targets. They're looking at manufacturing deliverables. Are they hitting outputs?"

72.     CW1 further stated that Micron uses a "Flash Report" to keep track of its quarterly goals. The Flash Report was created and maintained by the "Financial Planning & Analysis" or "FP&A" group. It begins at the start of each quarter, which lasts 13 weeks, and its starting point is the Company's forecast, which was extremely detailed. The report is updated weekly, and generated every Friday, to track Micron's progress on meeting its goals. CW1 stated

that "you're four weeks in and you didn't [meet your goals] in the first four weeks, the flash (report) would include actuals and then an updated forecast for the next nine weeks." CW1 further stated that "In addition to the sales side, (there would be) very high-level updates coming from manufacturing. If some process problem that would impact revenue, or if there was some significant expense." The reports also detailed forecasts, sales and performance of NAND and DRAM products specifically.

73.    CW1 further stated that "everyone sees the Flash Report," including high level executives. According to CW1, the Flash Report is specifically for the CFO, *i.e.*, Murphy, but that report and its weekly updates goes to the Company's executive group and financial planning and analysis group. CW1 stated that the Flash Report would reveal if the Company was falling short of sales goals.

### Background of the Chip Manufacturing Process

74.    Memory chips, including DRAM and NAND chips—Micron's primary products—are among the most complex manufactured products in the world and require extensive production time and precise manufacturing conditions. This lengthy manufacturing process creates significant lead times between production decisions and market availability, which is critical context for understanding Micron's statements about market demand and recovery.

75.    The memory chip manufacturing process consists of several distinct phases. First, ultra-pure silicon wafers are prepared as the foundation for chip creation, where wafers are "sliced from a salami-shaped bar of 99.99% pure silicon" and "polished to extreme

27

smoothness."[7] Next comes the photo resistant coating. During the next step, photolithography, patterns are transferred onto the wafer using a similar technology to developing photographs, followed by etching to remove material according to these patterns, creating the circuitry that will form the memory cells. For memory chips, this process is repeated dozens of times to create the complex three-dimensional structures needed for data storage. Next, the wafer is bombarded with positive or negative ions to tune the electrical conducting properties of the chip. The final step is the cutting of individual chips from the wafer (dicing), after which chips are assembled and mounted onto packages, connected with external pins, and undergo final testing before delivery.

76.    Manufacturing a finished memory chip for a customer typically takes up to 26 weeks (approximately 6 months) from order to delivery, according to a report by the Semiconductor Industry Association dated February 26, 2021.[8] The fabrication process alone requires about 12 weeks on average for standard processes, but can extend to 14-20 weeks for advanced technologies. After the main fabrication is complete, chips must undergo additional backend assembly, testing, and packaging, which adds another 6 weeks to the timeline.

77.    The manufacturing process involves extraordinary complexity. Producing a single semiconductor wafer can involve "up to 1,400 process steps" using highly sophisticated equipment.[9] For memory chips specifically, this includes multiple rounds of photolithography, deposition, etching, and testing under pristine clean room conditions.

---

[7] Alison Li, *6 crucial steps in semiconductor manufacturing*, ASML.com, Oct. 4, 2023, https://www.asml.com/en/news/stories/2021/semiconductor-manufacturing-process-steps.
[8] Semiconductor Industry Association, *Chipmakers Are Ramping Up Production to Address Semiconductor Shortage. Here's Why that Takes Time*, Semiconductors.org, Feb. 26, 2021, https://www.semiconductors.org/chipmakers-are-ramping-up-production-to-address-semiconductor-shortage-heres-why-that-takes-time/.
[9] *Id.*

78.     This extended production cycle means that memory manufacturers like Micron must make production decisions months in advance of anticipated market demand. Adjusting production capacity is not a rapid process—the semiconductor industry has noted that increasing capacity utilization "is not as easy as 'flipping a switch' and increasing chip output overnight" as the Semiconductor Industry Association ("SIA") put it.[10]

79.     Indeed, according to the SIA, "[w]hen market demand runs high…front-end semiconductor fabrication facilities, or fabs, will typically run above 80 percent capacity utilization, with some individual fabs running as high as between 90-100 percent."[11]

80.     Micron acknowledges these long lead times for its products in its SEC filings. For example, in its annual report on Form 10-K for FY2024, ("FY24 10K") which was filed with the SEC on October 4, 2024, Micron advised investors that "some of our components have long lead-times, requiring us to place orders up to a year in advance of anticipated demand. Such long lead-times increase the risk of excess inventory or loss of sales in the event our forecasts vary substantially from actual demand." The FY24 10K further advised that "[b]ecause of the lead times necessary to manufacture or products, we typically begin to process wafers before completion of performance and reliability testing."

81.     Accordingly, when manufacturers like the Company make statements about market recovery, these statements impact production decisions that will affect product availability and pricing multiple quarters later.

### The Company's Oversupply Woes Before the Relevant Period

82.     Beginning in the fourth quarter of 2022, Micron's revenues began a steep decline due to a weakening market for memory products. As the Company described in its quarterly

---

[10] *Id.*
[11] *Id.*

report on Form 10-Q for the third quarter of FY2023 ("3Q2023 10-Q"), which was filed on June 29, 2023, "[t]he memory and storage industry environment deteriorated sharply in the fourth quarter of 2022 and throughout 2023 due to weak demand in many end markets combined with global and macroeconomic challenges and lower demand resulting from customer actions to reduce inventory levels[,]" which "led to significant reductions in average selling prices for both DRAM and NAND and bit shipments for DRAM, resulting in declines in revenue across all [of Micron's] business segments and nearly all [of its] end markets."

83.      In the fourth fiscal quarter of 2022, according to an 8-K filed September 29, 2022, Micron's revenue fell from $6.643 billion, down from $8.642 billion in the prior quarter, and $8.274 billion the fourth quarter of 2021. Revenue continued to slide in FY 2023, falling to $4.085 billion in the first quarter, $3.693 billion in the second quarter, and $3.752 billion in the third quarter of 2023.

84.      Micron's financial situation was made substantially worse by the fact that while Micron's revenues declined, its cost of goods sold remained flat, leading Micron's gross profits to turn negative—meaning that Micron not only began running losses in fiscal 2023, but it lost money on each unit it sold, even before taking into account R&D, sales, and administrative expenses.

85.      This sudden slowdown in demand led Micron's inventories to increase from $6.6 billion in the end of fiscal 2022 to $8.4 billion at the end of Q1 2023. This weak demand led Micron to write down $1.43 billion in existing inventory in the second quarter of 2023, and a total of $1.83 billion in inventory in the last nine months of FY2023 (*i.e.*, November 2022 to August 2023) overall.

86.    The sudden slowdown in demand was also reflected when using the Company's data to calculate other inventory measures. Micron's inventory turnover, *i.e.*, its ability to sell inventory plummeted from 3.02x to 2.42x, and its days in inventory rose 25%, from 120 days to 150.6 days.

87.    Plaintiffs in the Related Securities Action retained an expert, Arcady Zaydenverg, to analyze Micron's increase inventory and movement in inventory turnover and days in inventory ratios in the fourth quarter of fiscal year 2022 and, as described further below, at the end of the Relevant Period (*i.e.*, the first quarter of fiscal year 2025).

88.    Mr. Zaydenverg is a Certified Public Accountant ("CPA") licensed in New York and a Certified Fraud Examiner ("CFE") with almost thirty years of experience in public and private accounting. He has worked as an external and internal accountant with a broad array of companies, including manufacturers, distributors, and service providers in various industries. He specializes in providing forensic accounting and litigation advisory services, which often includes, among other things, analyzing financial statements, performing financial modeling, analyzing the application of accounting and auditing standards, fraud investigations, and calculating commercial damages. Mr. Zaydenverg analyzed Micron's SEC filings from the fourth quarter of fiscal year 2021 (*i.e.*, the end of May 2021) to the second quarter of fiscal year 2025 (*i.e.*, the end of February 2025). Mr. Zaydenverg concluded that the movement in inventory amounts and inventory turnover and days in inventory ratios were not consistent with Micron experiencing an unexpected decline in demand.

89.    Another telltale sign that Micron had overestimated demand was that it reduced wafer starts in 2023 and recognized costs from underutilization of its facilities, taking an underutilization cost in the second quarter of 2023 of $27 million, a $132 million cost in the third

quarter, a $222 million cost in the fourth quarter, and a $165 underutilization cost in the first quarter of 2024.

90.    While this sudden drop off in demand was painful for Micron, it did have a silver lining—by promptly announcing the drop off in demand, Micron bolstered its reputation as a knowledgeable and forthright predictor of market conditions in the memory market. CNBC noted, in a July 1, 2022 article, that the previous day, "Mehrotra said on an earnings call with analysts that he expected smartphone unit volume to decline by around 5% versus last year. Analysts were expecting growth around 5%, Micron said. The company also warned that it believed that PC sales could decline 10% versus last year and that it was making changes to its production growth to match weaker demand." The article noted that "Micron supplies memory to smartphone makers including Apple, Motorola, and Asus, so it has a view into broader sales trends."

91.    Part of Micron's insight into supply and demand came from its long-term agreements ("LTAs") with its customers. As Defendant Mehrotra stated on a June 27, 2023 earnings call "our customers … work with us on LTAs. And as we have said, LTAs relate to their forecast for the year, generally. And while some customers may be operating on shorter term or other customers longer term, but generally speaking, they operate on yearly LTAs and LTAs involve supply and demand commitments from the two sides."

**Throughout the Relevant Period, the Company Makes
Bullish Predictions About Increasing Demand and Decreasing Supply**

92.    On March 28, 2023, Micron suddenly reversed course on its warnings. During the Company's Q2 2023 earnings call with analysts and investors, after markets closed, Mehrotra announced that "customer inventories have reduced in several end markets, and we see gradually improving supply-demand balance in the months ahead. Excluding the impact of inventory

write-downs, we believe our balance sheet DIO [Days Inventory Outstanding] has peaked in fiscal Q2, and we are close to our transition to sequential revenue growth in our quarterly results." Mehrotra boldly predicted that "[w]hile our industry faces significant near-term challenges, we believe that the memory and storage TAM [Total Addressable Market] will grow to a new record in calendar 2025 and will continue to outpace the growth of the semiconductor industry thereafter." The following day, when trading resumed, Micron's shares shot up $4.04 per share, or 6.7%, on more than double the usual trading volume.

93.    Mehrotra's confident prediction about the timing of recovery stood in stark contrast to industrywide predictions. For example, on March 28,2023, the same day that Micron announced its earnings, TrendForce predicted declining sales prices for DRAM in an article entitled, "Decline in DRAM ASP Narrows to 10~15% in 2Q23 with No End in Sight, Says TrendForce."[12] Likewise, SK Kim of Daiwa Capital Markets told CNN on April 27, 2023, that the market is facing a deep downturn, and that there will probably be a gradual recovery rather than a sharp rebound.[13]

94.    Mehrotra continued the optimistic tone in the following quarter, boasting that "[t]he ongoing improvement of customer inventories and memory content growth are driving higher industry demand, while production cuts across the industry continue to help reduce excess supply. As a result, pricing trends are improving, and we have increased confidence that the industry has passed the bottom for both quarterly revenue and year-on-year revenue growth."

---

[12] Press Release, *Decline in DRAM ASP Narrows to 10~15% in 2Q23 with No End in Sight, Says TrendForce*, TrendForce, Mar. 28, 2023, https://www.trendforce.com/presscenter/news/20230328-11626.html.

[13] Squawk Box Asia, *The Memory Chip Market is Facing an 'Deep Downturn,' Analyst Says*, CNBC.com, Apr. 27, 2023, https://www.cnbc.com/video/2023/04/27/the-memory-chip-market-is-facing-a-deep-downturn-analyst-says-.html.

Mehrotra went on to boast that "[b]eyond this downturn, we expect to see record TAM in calendar 2025 along with a return to more normalized levels of profitability."

95.    Mehrotra continued to trumpet the decline in supply in the following quarter, boasting that "in 2023, the industry has experienced extreme over supply and you know extreme negative effect on the profitability as well. And you see now that CapEx [capital expenditure] cuts and underutilization in the fab have been implemented across the industry given the CapEx constraints that we have, as well as given the poor profitability and certainly Micron has done that, but this is happening across the industry as well." Similarly in December, Mehrotra touted "significant supply reductions across the industry have enabled the recovery that is now underway", going on to state in March 2024 that the company "expect[s] calendar 2024 industry supply to be below demand for both DRAM and NAND" and in June 2024 that "Micron drove robust price increases as industry supply-demand conditions continued to improve". In September 2024, Mehrotra went on to boast that "[g]iven the significant reduction in the industry wafer capacity in NAND and the ongoing low NAND capex environment, we also expect a healthy industry supply demand environment for NAND in calendar 2025."

96.    This optimism was also inconsistent with what Micron's competitors were telling customers. For example, in a call with investors to report its results for the third quarter of calendar year 2023, Hynix told investors, "[r]ecovery from [DRAM] production cut will be gradual, in line with inventory level and market conditions," and "given that NAND's inventory is higher than DRAM's, conservative production will be maintained for NAND for the time being." Hynix further stated that "This will help turn around overall production growth in the DRAM and NAND industry to a positive growth next year, but only by a single digit." As to NAND, Hynix stated that "We have particularly seen [NAND] demand growth fall short of

34

expectations over the past two years despite a sharp decline in prices, but supply growth had continued leading to a sharp rise in inventory level and worsening profitability, prompting all companies to begin cutting production."

97.    The following quarter, *i.e.*, the fourth quarter of calendar year 2023, Hynix was again careful to manage expectations about future demand for NAND, stating on a call with analysts and investors that "overall production growth will be constrained as focus moves toward high-demand premium products requiring advanced processes while production of legacy products continues to decline. Therefore, despite the recovery in utilization, we estimate industry production growth to be within the single-digit range, mainly caused by the buy-side penalty impact in shifting production to value-added products." Later in the call, Hynix added, "For NAND, where recovery is more gradual, we focused on improving efficiency through production cuts of low-margin products and inventory reduction."

98.    Likewise, the following spring, on March 5, 2024, Western Digital's CEO, David Goeckeler, when asked, "what's the general tenor of supply-demand for NAND," told attendees at a conference that "supply demand is coming back into balance. We're not all the way there yet….if you look at what's going on now in the business, this quarter, bits will be down sequentially. Going into F Q4, we expect bits to be flat. So any change in the business in NAND is going to be all pricing driven." When asked about NAND capital expenditures Goeckeler continued, "we're still looking at a significant decline relative to last year. For the fiscal '24, basically, we still see a much lower -- significantly lower CapEx spend relative to fiscal '23." Goeckeler continued, "we've been getting this question a lot, especially in the drive business as demand starts to return, how fast can we add capacity back, and that's really not our focus. I

mean, our focus is getting to supply-demand balance. I mean, clearly, in NAND, we've got a way to go to until we get there."

99.    In July 2024, on an earnings call with analysts and investors to report Samsung's financial performance for the second quarter of calendar 2024, Samsung Executive Vice President Jaejune Kim was asked about the outlook for DRAM and NAND in the third quarter of calendar 2024. Kim expressed caution, telling analysts and investors, "we expect third quarter bit growth in DRAM and NAND to record low single-digit level. Also, considering the overall business cycle and market conditions, this is expected to be largely similar to the broad market levels."

100.    Later that month, on Hynix's earnings call for the second quarter of calendar 2024, Woo-Hyun Kim, Hynix's vice president and head of finance advised investors, "Third quarter DRAM bid shipment is expected to grow by low single digit percent sequentially, driven by further expansion of our HBM sales volume where strong demand is evident. NAND bid shipment is expected to decrease by mid-single-digit percent sequentially, despite increase in eSSD sales volume, given yet soft end demand in conventional applications and relatively high customer's inventory." Later in the call, a Hynix representative advised, "So with the exception of enterprise SSDs where demand for NAND is clearly growing, general applications such as PC and mobile demand is still showing a modest recovery and we are responding to market conditions by maintaining our strategy of optimizing investments and improving profitability."

101.    The following October, on an earnings call with analysts and investors to report Samsung's financial performance for the third quarter of calendar 2024, Kim was asked about the outlook for DRAM and NAND in the fourth quarter of calendar 2024. Kim continued to be cautious, telling attendees, "on the weaker mobile demand, we expect demand growth to be

constrained. And this, when combined with the base effect from low bit shipments in the third quarter, overall NAND bit shipment is expected to see limited growth at around the low single digit level."

**Competitive Threat Posed by State Backed Chinese Enterprises**

102.    The concept of "national champions" is a cornerstone of China's industrial policy, particularly in strategic sectors like semiconductors. Following the reform and opening up period that began in 1978, China has consistently invested in developing domestic semiconductor capabilities, but this strategy gained significant momentum and formalization with the establishment of the National Integrated Circuit Industry Investment Fund (commonly known as the "Big Fund") in 2014. This fund, which initially raised approximately $21 billion, was designed to support China's ambitions to reduce dependency on foreign technology and develop indigenous semiconductor capabilities, according to the Center for Strategic and International Studies ("CSIS").[14]

103.    China's strategic focus on semiconductors became even more pronounced following the April 2018 US sanctions against Chinese telecommunications giant ZTE, which highlighted China's vulnerability to foreign technology restrictions. As noted by CSIS, this incident marked a decisive turning point in China's semiconductor strategy, shifting the focus from purely economic considerations to viewing the industry primarily through a national security lens.[15] The Chinese government subsequently increased subsidies to prioritize domestic semiconductor capacity and reduce dependence on foreign technologies, especially from the US.

---

[14] Gregory Allen, *China's New Strategy for Waging the Microchip Tech War*, CSIS.org, May 3, 2023, https://www.csis.org/analysis/chinas-new-strategy-waging-microchip-tech-war.
[15] *Id.*

104.    In 2015, China formally launched the "Made in China 2025" strategic plan, which explicitly identified semiconductors as one of ten key sectors for development. According to McKinsey, the Chinese government adopted a distinctive approach in this plan: "There is a greater focus on creating segment winners, or national champions, through M&A and other government-supported activities."[16] This strategy aimed to concentrate resources on selected companies that could eventually compete globally with established industry leaders.

105.    With the release of China's 14th Five-Year Plan and statements from the 20th Party Congress, the emphasis on semiconductor self-sufficiency has been further elevated, with "science and technology self-reliance" and "secure and controllable supply chains" becoming central policy objectives, according to the UC Institute on Global Conflict and Cooperation.[17]

106.    Yangtze Memory Technologies Co. (YMTC) was founded in Wuhan, China, in July 2016 as a direct implementation of China's national champion strategy in the memory chip sector. As described in a letter from U.S. Congressman Michael McCaul and Senator Bill Hagerty to the Commerce Secretary, "YMTC is the PRC's state-owned national champion for memory chips — a type of semiconductor with defense, artificial Micronligence, and aerospace applications."[18]

107.    The state's commitment to YMTC as a national champion, and its specific purpose of reducing Micron and its competitors' respective footprints, has been well

---

[16] Christopher Thomas, *A New World Under Construction: China and Semiconductors, McKinsey.com*, Nov. 1, 2015, https://www.mckinsey.com/featured-insights/asia-pacific/a-new-world-under-construction-china-and-semiconductors.

[17] Jimmy Goodrich, *China's Evolving Semiconductor Strategy*, May 29, 2024, IGCC, https://ucigcc.org/blog/chinas-evolving-semiconductor-strategy/.

[18] Simon Lester, *National Security and International Competition in Semiconductors: YMTC and the Commerce Department's Entity List*, China Trade Monitor, Jul. 13, 2021, https://www.chinatrademonitor.com/national-security-and-international-competition-in-semiconductors/.

documented. For example, in June 2022, Nikkei Asia reported that the company was planning to "bring online a second plant in its home city of Wuhan as early as the end of 2022" to "close the company's technology and output gap with global leaders such as Samsung of South Korea and Micron Technology of the US." The article further reported that YMTC's growth "put it on the world's semiconductor map and delivered a notable success in Beijing's attempt to reduce China's reliance on imported chips." Indeed, YMTC specialized in NAND memory, and the new plant was designed to be able to shift to "more cutting edge chips" manufactured by Micron, Samsung, and SK Hynix.[19] The plant was hoping to get the ability to manufacture these chips by 2024. The plant would also get YMTC to expand its market share to more than 10% globally, *i.e.*, approximately Micron's share of the market. In fact, to avoid sanctions, YMTC was reportedly, "maintain[ing] good relationships with US and other foreign vendors to ensure its expansion plans come to fruition."

108.    YMTC has also benefitted from continued state financial support, particularly in response to external challenges. As reported in the Nikkei Asia article described above, YTMC is backed by the China Integrated Circuit Industry Investment Fund, "Beijing's most important chip investment funding vehicle." In March 2023, following US trade restrictions, YMTC received a massive capital injection of US$7 billion from state-backed investors, including the second phase of the China Integrated Circuit Industry Investment Fund. This funding was widely interpreted as Beijing "doubling down on its efforts to shore up domestic chip production amid growing tensions with the US."[20]

---

[19] Cheng Ting-Fang, *China's Yangtze Memory Takes On Rivals With New Chip Plant*, Nikkei Asia, Jun. 26, 2022.
[20] Ann Cao, *Tech war: China's top memory chip maker YMTC gets US$7 billion from state-backed investors*, South China Morning Post, Mar. 2, 2023, https://www.scmp.com/tech/tech-

109.    By 2021, YMTC attained a 5% market share in NAND memory, according to an August 5, 2022 article in the South China Morning Post.[21]

110.    According to The Register, by November 2023, YMTC had already utilized the $7 billion in capital received earlier that year "on replacing equipment and the development of new components and chipmaking tools, following the company being placed on US blacklists last year that barred it from buying American-made chip design and manufacturing kit."[22]

111.    All of this was known to Defendants throughout the Relevant Period. Indeed, Micron repeatedly told investors that "we face the threat of increasing competition as a result of significant investment in the semiconductor industry by the Chinese government and various state-owned or affiliated entities, in companies such as Yangtze Memory Technologies Co., Ltd. ("YMTC") and ChangXin Memory Technologies, Inc. ("CXMT")." These statements assured investors that Defendants were aware of YMTC's status as a competitive threat and that Defendants were taking that threat into account when repeatedly and publicly speaking about global supply and demand conditions in the memory chip sector.

**False and Misleading Statements During the Relevant Period**

112.    On March 28, 2023, after the close of trading, Micron issued a press release for its Q2 2023 earnings. It quoted Mehrotra, stating, in pertinent part, that "[c]ustomer inventories are getting better, and we expect gradual improvements to the industry's supply-demand balance.

---

war/article/3212118/tech-war-chinas-top-memory-chip-maker-ymtc-gets-us7-billion-state-backed-investors.

[21] *Tech war: China's memory chip champion YMTC stays mum amid threat of US sanctions*, South China Morning Post, Aug. 5, 2022, https://finance.yahoo.com/news/tech-war-chinas-memory-chip-093000273.html.

[22] Dan Robinson, *China's YMTC scrounges for billions to help bypass US sanctions*, The Register, Nov. 2, 2023, https://www.theregister.com/2023/11/02/chip_wars_hit_ymtc/.

We remain confident in long-term demand and are investing prudently to preserve our technology and product portfolio competitiveness."

113.    The above statements were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because by assuring investors that Defendants were "confident in long-term demand," Defendants failed to fulfill their duty to disclose the full truth and created a misimpression of supply and demand for investors and failed to disclose that the characterization of supply and demand ignored factors known or knowable to Micron, including the weakness in customer demand and the competitive threat posed by YMTC.

114.    On March 28, 2023, at its Q2 2023 earnings call, Mehrotra stated that "[w]hile our industry faces significant near-term challenges, we believe that the memory and storage TAM will grow to a new record in calendar 2025 and will continue to outpace the growth of the semiconductor industry thereafter."

115.    The above statements were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because by assuring investors that "memory and storage TAM will grow to a new record in calendar 2025," Defendants failed to fulfill their duty to disclose the full truth and created a misimpression of supply and demand for investors and failed to disclose that the characterization of supply and demand ignored factors known or knowable to Micron, including the weakness in customer demand and the competitive threat posed by YMTC.

116.    On that same call, Mehrotra stated that:

And particularly, keeping it in mind the strong demand trends. *I talked about 2025 being -- we think will be a record revenue year for the industry because last 2 years have been slow demand growth in terms of shipments. We think '24 and '25 will be strong years that will drive strong growth*. You are seeing actions

on the supply side. The health of the industry will be restored in the future quarters.

117.    The above statements were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because by assuring investors that "we think will be a record revenue year for the industry because last 2 years have been slow demand growth in terms of shipments," Defendants failed to fulfill their duty to disclose the full truth and created a misimpression of supply and demand for investors and failed to disclose that the characterization of supply and demand ignored factors known or knowable to Micron, including the weakness in customer demand and the competitive threat posed by YMTC.

118.    On that same call, Mehrotra answered a question from an analyst as follows:

**Christopher Muse**

I guess I was hoping to get your sense of how you're thinking about the shape of the recovery. Obviously, things don't look great today, but you've been through this before and will get through it. And so would love to hear your thoughts around how you think will come out of this. And given the CapEx cuts we've seen across the industry, it certainly looks like we're going to be an undersupply situation, at least for DRAM in calendar '24. I'm curious what some of your largest customers are saying today, particularly in the data center as they start to consider this likelihood.

**Sanjay Mehrotra**

Thanks, C.J., for the question. So I think we can look at the question from the demand and the supply point of view. ***And from the demand side, as we have indicated that we are seeing that the customer inventories are improving while still elevated, but in aggregate, customer inventories are improving. And we do expect that the volume of shipments, both for DRAM and NAND, will continue to increase on a sequential basis from here on.***

***And of course, on the supply side, you have heard actions from industry players and through various reports, you have seen that the CapEx reductions are being made as well as underutilization is being made in the industry. And that is going to be taking out a chunk of—it will take a bite at the supply in the industry. So basically, the supply trend will also begin to improve. So the***

*demand and supply balance will gradually improve through the course of the year.*

119.    The above statements were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because by assuring investors that "we do expect that the volume of shipments, both for DRAM and NAND, will continue to increase on a sequential basis from here on," Defendants failed to fulfill their duty to disclose the full truth and created a misimpression of supply and demand for investors and failed to disclose that the characterization of supply and demand ignored factors known or knowable to Micron, including the weakness in customer demand and the competitive threat posed by YMTC.

120.    On June 28, 2023, after the close of trading, Micron issued a press release for its Q3 2023 earnings. It quoted Mehrotra, stating, in pertinent part, that "*We believe that the memory industry has passed its trough in revenue, and we expect margins to improve as industry supply-demand balance is gradually restored*."

121.    The above statements were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because by assuring investors that "memory industry has passed its trough in revenue, and we expect margins to improve as industry supply-demand balance is gradually restored," Defendants failed to fulfill their duty to disclose the full truth and created a misimpression of supply and demand for investors and failed to disclose that the characterization of supply and demand ignored factors known or knowable to Micron, including the weakness in customer demand and the competitive threat posed by YMTC.

122.    On June 28, 2023, at its Q3 2023 earnings call, Mehrotra stated as follows:

Micron delivered fiscal third quarter revenue within our guidance range, with gross margin and EPS above the range. ***The ongoing improvement of customer inventories and memory content growth are driving higher industry demand, while production cuts across the industry continue to help reduce excess supply. As a result, pricing trends are improving, and we have increased confidence that the industry has passed the bottom for both quarterly revenue and year-on-year revenue growth***.

123.    The above statements were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because by assuring investors that "pricing trends are improving, and we have increased confidence that the industry has passed the bottom for both quarterly revenue and year-on-year revenue growth," Defendants failed to fulfill their duty to disclose the full truth and created a misimpression of supply and demand for investors and failed to disclose that the characterization of supply and demand ignored factors known or knowable to Micron, including the weakness in customer demand and the competitive threat posed by YMTC.

124.    On that same call, Mehrotra also stated:

While the industry demand forecast for calendar 2023 is now lower, the significant supply reductions across the industry have started to stabilize the market. ***We see both DRAM and NAND year-over-year supply growth to be negative for the industry in calendar 2023 as utilization and CapEx cuts across the industry impact supply growth***.

125.    The above statements were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because by assuring investors that "We see both DRAM and NAND year-over-year supply growth to be negative for the industry in calendar 2023 as utilization and CapEx cuts across the industry impact supply growth," Defendants failed to fulfill their duty to disclose the full truth and created a misimpression of supply and demand for investors and failed to disclose that the

characterization of supply and demand ignored factors known or knowable to Micron, including the weakness in customer demand and the competitive threat posed by YMTC.

126.    On September 27, 2023, Micron issued a press release during after-market hours announcing its fiscal fourth quarter and full year 2023 results. The press release quoted Defendant Mehrotra as stating, in relevant part:

> During fiscal 2023, amid a challenging environment for the memory and storage industry, Micron sustained technology leadership, launched a significant number of leading-edge products, and took decisive actions on supply and cost . . . . ***Our 2023 performance positions us well as a market recovery takes shape in 2024, driven by increasing demand and disciplined supply. We look forward to record industry TAM [total addressable market] revenue in 2025 as AI proliferates from the data center to the edge***.

127.    The above statements were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because by assuring investors that "Our 2023 performance positions us well as a market recovery takes shape in 2024, driven by increasing demand and disciplined supply," Defendants failed to fulfill their duty to disclose the full truth and created a misimpression of supply and demand for investors and failed to disclose that the characterization of supply and demand ignored factors known or knowable to Micron, including the weakness in customer demand and the competitive threat posed by YMTC.

128.    That same day, Defendant Mehrotra participated in an earnings call for Q4 2023. Mehrotra stated, in pertinent part that "***[o]ngoing demand growth, customer inventory normalization, and industry-wide supply reductions have set the stage for increased revenue, along with improved pricing and profitability throughout fiscal 2024***."

129.    The above statements were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because by

assuring investors that "Our 2023 performance positions us well as a market recovery takes shape in 2024, driven by increasing demand and disciplined supply," Defendants failed to fulfill their duty to disclose the full truth and created a misimpression of supply and demand for investors and failed to disclose that the characterization of supply and demand ignored factors known or knowable to Micron, including the weakness in customer demand and the competitive threat posed by YMTC.

130.    On that call, Mehrotra responded to a question as follows:

**Thomas O'Malley**

I just want to understand the trajectory here on the NAND business. You guys in the quarter kind of took your demand profile from high-single-digits to high teens and you pointed out consumer in particular. What can you do to give us confidence that, that wasn't a pull in from some of your large consumer customers, and that later this year there might be a little hole there, and just talk about the trajectory of where you see that business going, just given you said that bits are going to be down sequentially into November?

**Sanjay Mehrotra**

So with respect to NAND, yes, I mean compared to what we have said before, we saw strong demand, particularly on the consumer, including some parts of the channel and the consumer part included likes of smartphones, PCs, etc, and again, as I pointed out, the channel as well. And keep in mind, with the pricing that has existed for NAND, elasticity has certainly kicked in. The content is continuing to increase in the devices. Today, flagship smartphones have minimum of 8 gigabyte DRAM and 128 gigabyte of NAND. So that's the overall trend and same thing in PCs that the elasticity is driving, increasing average capacities. And overall certainly strategic vibe have influenced some of the NAND demand for the year as well. ***And keep in mind that next year in 2024, we see that the demand growth will be pretty much close to the long-term CAGR for NAND. And the strat buyers—the strategic buyers that I mentioned, of course, they help improve the inventory position for NAND as well. So overall, of course, supply cuts have been made in NAND as well. And as we look ahead, we do see that the demand and supply fundamentals will continue to improve on the NAND side*** as well.

131.    The above statements were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because by

assuring investors that "next year in 2024, we see that the demand growth will be pretty much close to the long-term CAGR for NAND," Defendants failed to fulfill their duty to disclose the full truth and created a misimpression of supply and demand for investors and failed to disclose that the characterization of supply and demand ignored factors known or knowable to Micron, including the weakness in customer demand and the competitive threat posed by YMTC.

132.    Later on that call, Mehrotra responded to a question as follows:

**Mehdi Hosseini**

Great, thanks for detail. And second question has to do with the puts and takes in reducing wafer starts. And I understand that more emphasis is on the trade mix. But as I think about memory like, there is no trailing edge. And in that context as you think about bringing utilization rate back up to the normal level. and some of the trailing edge converted to the leading edge, could that help with a bigger step-up in gross margin improvement? How should we think about it, assuming that the trailing edge would be phased out?

**Sanjay Mehrotra**

Well, good question and I think I would like to take the opportunity to provide some context here and overall background. As you know that in 2023, the industry has experienced extreme over supply and you know extreme negative effect on the profitability as well. ***And you see now that capex cuts and underutilization in the fab have been implemented across the industry given the capex constraints that we have, as well as given the poor profitability and certainly Micron has done that, but this is happening across the industry as well. And at the same time, the demand for the new products is increasing that requires, you know, as you were pointing out, leading edge technology as well***. And in order to maintain our supply discipline and to meet the demand for these new products such as HBM, such as DDR5, we are shifting some of our equipment from older nodes into the newer technologies to ramp up those newer technologies into production.

133.    The above statements were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because Defendants failed to fulfill their duty to disclose the full truth and created a misimpression of supply and demand for investors and the state of the semiconductor industry and failed to

disclose that the characterization of supply and demand ignored factors known or knowable to Micron, including the weakness in customer demand and the competitive threat posed by YMTC.

134.    On October 6, 2023, Micron filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operating results for its fiscal fourth quarter and year ended August 31, 2023 (the "2023 10-K"). With respect to the purported overall recovery of demand for Micron's products, the 2023 10-K stated, in relevant part:

> ***Ongoing demand growth, customer inventory normalization, and industry-wide supply discipline have set the stage for increased revenue, and improved pricing and profitability throughout fiscal 2024***. As a result, pricing trends have started to improve and there were no write downs of inventories to net realizable value in the fourth quarter of 2023.

135.    The above statements were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because by assuring investors that "Ongoing demand growth, customer inventory normalization, and industry-wide supply discipline have set the stage for increased revenue, and improved pricing and profitability throughout fiscal 2024," Defendants failed to fulfill their duty to disclose the full truth and created a misimpression of supply and demand for investors and failed to disclose that the characterization of supply and demand ignored factors known or knowable to Micron, including the weakness in customer demand and the competitive threat posed by YMTC.

136.    The 2023 10-K also stated, in relevant part, that "***demand for DRAM and NAND is improving as customer inventory levels continue to normalize and secular growth drivers remain intact[.]***"

137.    The above statements were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because by

48

assuring investors that "demand for DRAM and NAND is improving as customer inventory levels continue to normalize and secular growth drivers remain intact," Defendants failed to fulfill their duty to disclose the full truth and created a misimpression of supply and demand for investors because Defendants knew, but did not disclose, the weakness in customer demand and the competitive threat posed by YMTC.

138.    On November 29, 2023, the Company filed its annual Proxy Statement on Form DEF 14A (the "2023 Proxy Statement"). The 2023 Proxy Statement was solicited by Defendants Mehrotra, Beyer, Dugle, Gomo, Haynesworth, McCarthy, Switz, and Wright.

139.    The 2023 Proxy Statement solicited shareholders to vote to approve, among others: (i) reelect Defendants Mehrotra, Beyer, Dugle, Gomo, Haynesworth, McCarthy, Switz, and Wright to the Board; (ii) approve, on an advisory basis, executive compensation; (iii) approve, on an advisory basis, the frequency of future votes on executive compensation; and (iv) ratify the appointment of PricewaterhouseCoopers LLP as the Company's independent registered public accounting firm for the 2024 Fiscal Year.

140.    With respect to the Company's Code, the 2023 Proxy Statement stated:

Acting ethically is a critical part of our culture and our vision to transform how the world uses information to enrich life for all. The Board has adopted a Code of Business Conduct and Ethics that is applicable to all our directors, officers, and team members. The Code of Business Conduct and Ethics sets out our expectations regarding the treatment of our team members, customers, and the communities in which we operate, as well as our commitment to high product quality, ethical and legal sourcing of our materials, and acting with integrity for our investors. A copy of our Code of Business Conduct and Ethics is available at www.micron.com and is also available in print without charge upon request. Any amendments or waivers of the Code of Business Conduct and Ethics will also be posted on our website within four business days of the amendment or waiver as required by applicable rules and regulations of the SEC and the Listing Rules of Nasdaq.

141.    Regarding risk, the 2023 Proxy Statement stated:

We operate in a dynamic economic, social, and political landscape, making structured and conscientious risk management more important than ever. Our Board reviews and oversees our enterprise risk management program, which is a unified approach to risk management that helps us achieve a shared understanding of risks and make informed business decisions. This approach enhances our capability to address future events that create uncertainty and respond in an efficient and effective manner. It also facilitates prompt action to mitigate identified risks and embeds risk management into our culture.

The Board has delegated primary oversight of our enterprise risk management process to the Audit Committee, which conducts reviews of our risk assessment and enterprise risk management policies as described below, including overseeing the management of risks related to financial reporting and compliance. Other Board committees provide additional insights into our enterprise risk management program in the areas of their core competencies, and report to the Board regularly on matters relating to the following specific areas of risk the committees oversee:

- The Compensation Committee oversees management of risks relating to our compensation plans and programs.

- The Finance Committee oversees the Company's strategies for management of significant financial risks.

- The Governance and Sustainability Committee oversees risks associated with the Board's governance, director independence, the Company's human capital programs and sustainability initiatives, and public policy and government affairs activities.

- The Security Committee oversees risks associated with physical security and cybersecurity.

In performing their oversight responsibilities, the Board and each committee has full access to management, as well as the ability to engage independent advisors. In addition, the Chairman of the Board leads regular executive sessions of the independent directors, facilitates cross-committee feedback, and fosters open dialogue and constructive feedback among the independent directors, which further supports the Board's ability to fulfill its risk oversight duties.

142.    Defendants Mehrotra, Beyer, Dugle, Gomo, Haynesworth, McCarthy, Switz, and Wright caused the 2023 Proxy Statement to be false and misleading in nature because they failed to disclose that demand for DRAM and NAND was not as strong as Defendants indicated and the competitive threat posed by YMTC. Furthermore, the 2023 Proxy Statement was false and

misleading because, despite assertions to the contrary, the Company's Board was not in fact performing its risk oversight function at an adequate level, and thus, the Director Defendants were in violation of the Code.

143.    Due to the materially false and misleading 2023 Proxy Statement, the Company's shareholders voted, among others, to: (i) reelect Defendants Mehrotra, Beyer, Dugle, Gomo, Haynesworth, McCarthy, Switz, and Wright to the Board; (ii) approve, on an advisory basis, executive compensation; (iii) approve, on an advisory basis, the frequency of future votes on executive compensation; and (iv) ratify the appointment of PricewaterhouseCoopers LLP as the Company's independent registered public accounting firm for the 2024 Fiscal Year.

144.    On December 20, 2023, Micron issued a press release announcing earnings for the first quarter of fiscal 2024. That press release quoted Mehrotra as stating that **"[w]e expect our business fundamentals to improve throughout 2024, with record industry TAM projected for calendar 2025**."

145.    The above statements were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because by assuring investors that "[w]e expect our business fundamentals to improve throughout 2024, with record industry TAM projected for calendar 2025," Defendants failed to fulfill their duty to disclose the full truth and created a misimpression of supply and demand for investors and failed to disclose that the characterization of supply and demand ignored factors known or knowable to Micron, including the weakness in customer demand and the competitive threat posed by YMTC.

146.    That same day, on the Company's Q1 2024 earnings call, Defendant Mehrotra stated:

Now turning to our market outlook, starting with demand. We expect calendar 2023 DRAM bit demand to grow in the high-single-digit percentage range, up from prior expectations for mid-single-digit growth. In NAND, we continue to expect calendar 2023 bit demand growth in the high-teens percentage range. *Looking forward, over the next few years, we expect bit demand growth CAGRs of mid-teens in DRAM and low-20s percentage range in NAND. We forecast calendar 2024 bit demand growth for the industry to be near the long-term CAGR for DRAM and somewhat below the long-term CAGR for NAND.*

147.    The above statements were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because by assuring investors that "we expect bit demand growth CAGRs of mid-teens in DRAM and low-20s percentage range in NAND. We forecast calendar 2024 bit demand growth for the industry to be near the long-term CAGR for DRAM and somewhat below the long-term CAGR for NAND," Defendants failed to fulfill their duty to disclose the full truth and created a misimpression of supply and demand for investors and failed to disclose that the characterization of supply and demand ignored factors known or knowable to Micron, including the weakness in customer demand and the competitive threat posed by YMTC.

148.    On that same call, Mehrotra responded to an analyst question as follows:

**Krish Sankar**

Yes. Hi. Thanks for taking my question. Sanjay or Mark, the first question I had is kind of you spoke about sustainability of pricing in calendar '24. I'm kind of curious if you can peel the onion one layer below and say how we think about pricing through calendar '24 for DRAM and NAND, and if you can extrapolate it into 2025, that'll be very helpful. And then I had a follow-up.

**Sanjay Mehrotra**

Thanks, Krish for the question. And with respect to the pricing, *we of course expect pricing to continue to strengthen during calendar 2024. And this is because of the healthy demand-supply balance as we discussed in the context of our script.* As you have seen, there have been significant cuts in supply growth in the industry. Customer inventories have normalized, supplier inventories are improving, as we have discussed our own inventory here as well. And pricing will continue to improve as a result through the course of the year.

And of course, you know, ***the demand trends overall, because of improvement of customer inventories are in PCs, in smartphones, automotive and industrial, the demand trend will continue. And in sometime in first half of '24, calendar '24, we expect data center inventories at customers to get normalized as well. And beyond that point, we would expect data center to become another boost in demand in 2024. So we expect pricing to continue to increase both in NAND and in DRAM as well. And we expect a healthy demand-supply environment in 2025 as well as a healthy pricing environment in '25 too.***

149. The above statements were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because by assuring investors about the strength of the NAND and DRAM market for 2024 and 2025, Defendants failed to fulfill their duty to disclose the full truth and created a misimpression of supply and demand for investors and failed to disclose that the characterization of supply and demand ignored factors known or knowable to Micron, including the weakness in customer demand and the competitive threat posed by YMTC.

150. On December 21, 2023, Micron filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the first quarter of its fiscal year 2024 (the "1Q24 10-Q"). With respect to the purported overall recovery of demand for Micron's products, the 1Q24 10-Q stated, in relevant part:

> ***For the first quarter of 2024, improving demand growth driven in part by deployment of [AI], customer inventory normalization, and industry-wide supply discipline, resulted in an improved industry supply and demand balance***.
> As a result, we have experienced improvements in pricing and margins.

151. The above statements were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because by electing to characterize and provide reasons for a purported "supply and demand balance," Defendants failed to fulfill their duty to disclose the full truth and created a misimpression of supply and demand for investors and failed to disclose that the characterization of supply and

demand ignored factors known or knowable to Micron, including the weakness in customer demand and the competitive threat posed by YMTC.

152.    The 1Q24 10-Q also stated, in relevant part, that "for the first quarter of 2024 as compared to the fourth quarter of 2023 . . . MBU revenue increased 7% primarily due to increases in average selling prices and NAND bit shipments, driven by improved end market demand."

153.    The above statements were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because by electing to characterize NAND demand, Defendants failed to fulfill their duty to disclose the full truth and created a misimpression of supply and demand for investors and failed to disclose that the characterization of supply and demand ignored factors known or knowable to Micron, including the weakness in customer demand and the competitive threat posed by YMTC.

154.    On March 20, 2024, on an earnings call for Q2 2024, Defendant Mehrotra stated, in pertinent part:

> Now, turning to our market outlook. Calendar 2023 DRAM bit demand growth was in the low double-digit percentage range, and NAND bit demand growth was in the low-20s percentage range, both a few percentage points higher than previous expectations. ***We forecast calendar 2024 bit demand growth for the industry to be near the long-term CAGR for DRAM and around the mid-teens for NAND***.
>
> Given the higher baseline of 2023 demand, these expectations of 2024 bit growth have driven an increase in the absolute level of 2024 bit demand in our model for DRAM and NAND versus our prior expectations. ***The industry supply-demand balance is tight for DRAM and NAND, and our outlook for pricing has increased for calendar 2024. Over the medium term, we expect bit demand growth CAGRs of mid-teens in DRAM and low-20s percentage range in NAND***.

155.    The above statements were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because by

assuring investors about the strength of the NAND and DRAM market for 2024 and 2025, Defendants failed to fulfill their duty to disclose the full truth and created a misimpression of supply and demand for investors and failed to disclose that the characterization of supply and demand ignored factors known or knowable to Micron, including the weakness in customer demand and the competitive threat posed by YMTC.

156.    On that same call, Defendant Murphy stated that "[n]ow turning to our outlook for the fiscal third quarter. Fiscal Q3 bit shipments are expected to be down modestly for DRAM and up somewhat for NAND, compared to fiscal Q2 levels. ***While demand continues to improve, supply is constrained, especially at the leading edge. We expect DIO to improve sequentially in fiscal Q3***."

157.    The above statements were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because by assuring investors that "While demand continues to improve, supply is constrained, especially at the leading edge. We expect DIO to improve sequentially in fiscal Q3," Defendants failed to fulfill their duty to disclose the full truth and created a misimpression of supply and demand for investors and failed to disclose that the characterization of supply and demand ignored factors known or knowable to Micron, including the weakness in customer demand and the competitive threat posed by YMTC.

158.    On March 21, 2024, Micron filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the second quarter of its fiscal year 2024 (the "2Q24 10-Q"). With respect to the purported overall recovery of demand for Micron's products, the 2Q24 10-Q stated, in relevant part:

> ***For the first six months of 2024, increasing demand growth, driven in part by deployment of [AI] and mostly normal customer inventories, combined with***

*industry-wide supply discipline, resulted in an improved industry supply and demand balance*. As a result, we have experienced improvements in pricing and margins in 2024.

159.     The above statements were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because by electing to characterize semiconductor supply and demand as "balanced," Defendants failed to fulfill their duty to disclose the full truth and created a misimpression of supply and demand for investors and failed to disclose that the characterization of supply and demand ignored factors known or knowable to Micron, including the weakness in customer demand and the competitive threat posed by YMTC.

160.     The 2Q24 10-Q also stated, in relevant part, that "for the second quarter of 2024 as compared to the first quarter of 2024 . . . SBU revenue increased 39% primarily due to increases in NAND average selling prices and bit shipments *driven by strong demand across markets*" and that "CNBU, MBU, and SBU operating income (loss) improved primarily due to increases in average selling prices *as a result of improving conditions across most markets*."

161.     The above statements were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because by electing to characterize affirmatively semiconductor markets, Defendants failed to fulfill their duty to disclose the full truth and created a misimpression of supply and demand for investors and failed to disclose that the characterization of supply and demand ignored factors known or knowable to Micron, including the weakness in customer demand and the competitive threat posed by YMTC.

162.    On June 26, 2024, Micron issued a press release announcing its results for the third quarter of its fiscal year 2024, which quoted Defendant Mehrotra as stating, in relevant part, that Micron is "***well positioned to deliver a substantial revenue record in fiscal 2025***."

163.    The above statements were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because by electing to characterize Micron's revenue producing ability, Defendants failed to fulfill their duty to disclose the full truth and created a misimpression of supply and demand for investors and failed to disclose that the characterization of supply and demand ignored factors known or knowable to Micron, including the weakness in customer demand and the competitive threat posed by YMTC.

164.    That same day, on an earnings call with analysts and investors to report the Company's financial results for the third quarter of FY2024 ("3QFY24 Call"), Mehrotra touted the coming increased demand for DRAM and NAND:

> Enabling AGI will require training ever-increasing model sizes with trillions of parameters and sophisticated servers for inferencing. AI will also permeate to the edge via AI PCs and AI smartphones, as well as smart automobiles and intelligent industrial systems. ***These trends will drive significant growth in the demand for DRAM and NAND, and we believe that Micron will be one of the biggest beneficiaries in the semiconductor industry of the multi-year growth opportunity driven by AI***.

165.    The above statements were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because by electing to characterize the demand of DRAM and NAND, Defendants failed to fulfill their duty to disclose the full truth and created a misimpression of supply and demand for investors and failed to disclose that the characterization of supply and demand ignored factors known or

knowable to Micron, including the weakness in customer demand and the competitive threat posed by YMTC.

166.    On that same call, surprised by Mehrotra's bullish statements, analysts pushed scrutinized Mehrotra's boasts. For example, analyst Krish Sankar of TD Cowen asked Mehrotra:

> Another quick follow-up, on NAND, in this -- on the NAND bit demand, you kind of mentioned that the bit growth -- demand bit growth is going to be in the high teens. If I remember right, last quarter, you said it's going to be in the low 20%s. So, I'm kind of curious, what was the delta since last few months ago? Because there's a general view that AI should be helping NAND. So, why is the NAND bit demand growth not going higher? Looks like it's going lower.

167.    Rather than admit the truth, Defendant Mehrotra assured Cowen that NAND demand would remain high, stating:

> I'll just provide you some color. The data center, automotive, and industrial, these are all growing faster in terms of NAND demand versus the CAGR that we have shared. Client, mobile, and consumer somewhat slower. ***But these slow-growing segments actually have also average capacity increases ahead of them***.

168.    The above statements were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because by electing to characterize the NAND segment, Defendants failed to fulfill their duty to disclose the full truth and created a misimpression of supply and demand for investors and failed to disclose that the characterization of supply and demand ignored factors known or knowable to Micron, including the weakness in customer demand and the competitive threat posed by YMTC.

169.    The next day, June 27, 2024, Micron filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the third quarter of its fiscal year 2024 (the "3Q24 10-Q"). With respect to the purported overall recovery of demand for Micron's products, the 3Q24 10-Q stated, in relevant part:

> For the first nine months of 2024, ***increasing demand growth, driven in part by deployment of [AI] and mostly normal customer inventories, combined with***

**industry-wide supply discipline, resulted in an improved industry supply and demand balance**. As a result, we have experienced improvements in pricing and margins in 2024.

170. The above statements were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because by electing to characterize the semiconductor supply and demand, Defendants failed to fulfill their duty to disclose the full truth and created a misimpression of supply and demand for investors and failed to disclose that the characterization of supply and demand ignored factors known or knowable to Micron, including the weakness in customer demand and the competitive threat posed by YMTC.

171. The 3Q24 10-Q also stated, in relevant part, that "[f]or the third quarter of 2024 as compared to the third quarter of 2023, CNBU, MBU, and SBU operating income (loss) improved primarily due to increases in average selling prices . . . and increases in bit sales **as a result of improving conditions across most markets in 2024**"; and that "[f]or the first nine months of 2024 as compared to the first nine months of 2023, operating income (loss) improved for CNBU, MBU, and SBU primarily due to . . . increases in bit sales, and increases in MBU and SBU average selling prices **as a result of improving conditions across most markets in 2024**."

172. The above statements were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because by electing to characterize the semiconductor market, Defendants failed to fulfill their duty to disclose the full truth and created a misimpression of supply and demand for investors and failed to disclose that the characterization of supply and demand ignored factors known or knowable to Micron, including the weakness in customer demand and the competitive threat posed by YMTC.

173.    On September 25, 2024, Micron issued a press release announcing its fiscal fourth quarter and FY2024 results, in which Defendant Mehrotra touted the Company's future with using a host of superlatives, including "***We are entering fiscal 2025 with the best competitive positioning in Micron's history. We forecast record revenue in fiscal Q1 and a substantial revenue record with significantly improved profitability in fiscal 2025***."

174.    The above statements were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because by electing to characterize Micron's competitive positioning, Defendants failed to fulfill their duty to disclose the full truth and created a misimpression of supply and demand for investors and failed to disclose that the characterization of supply and demand ignored factors known or knowable to Micron, including the weakness in customer demand and the competitive threat posed by YMTC.

175.    That same day, on an earnings call with analysts and investors to disclose the Company's fourth quarter and full year for FY24 ("FY24 Call"). On the call, Mehrotra touted to investors:

> ***Given the significant reduction in industry wafer capacity in NAND and the ongoing low NAND CapEx environment, we also expect a healthy industry supply-demand environment for NAND in calendar 2025***. NAND technology transitions generally provide more growth in annualized bits per wafer compared to the NAND bit demand CAGR expectation of high teens.

176.    The above statements were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because by electing to characterize supply and demand for the NAND segment, Defendants failed to fulfill their duty to disclose the full truth and created a misimpression of supply and demand for investors and failed to disclose that the characterization of supply and demand ignored factors

known or knowable to Micron, including the weakness in customer demand and the competitive threat posed by YMTC.

177.    Also on FY24 Call, Mehrotra touted that "[w]e look forward to delivering a substantial revenue record with significantly improved profitability in fiscal 2025, beginning with our guidance for record quarterly revenue in fiscal Q1. ***Micron is ramping production of the industry's most advanced technology nodes in both DRAM and NAND***."

178.    The above statements were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because Defendants' failed to disclose that Micron was not ramping production and was anticipating a slowdown in demand.

179.    During the question and answer portion of the call, analyst CJ Muse of Cantor Fitzgerald asked Defendant Murphy:

> I guess first question on gross margins. You guided up a robust 300 basis points. I was hoping you could spend a little bit of time kind of walking us through what's driving that? How much is from like-for-like DRAM ASP increases, mix, HBM yield improvements and cost downs. And I guess, as you kind of walk through that, can you give us a flavor of how to think about those drivers beyond the November quarter?

180.    Murphy responded by touting how Micron would benefit in the first quarter of fiscal year 2024:

> So C.J., in the fourth or first quarter, as we look at that margin expansion, it's similar to the themes we've talked about before. ***The supply-demand environment is healthy***. So we're seeing that play through on -- in pricing. We're also seeing the execution of our product road map and the ramp of the higher-value products and that's contributing. On costs, we are doing well on cost downs.
>
> However, in the first quarter because of the mix with HBM, we are going to see DRAM costs go up slightly. ***And that's so as we look forward into the first quarter, things are coming together as we had hoped, tied at the leading edge, good supply demand, favorable pricing environment and certainly favorable***

*mix and that becoming a more important part of the business and good cost execution*.

181.    The above statements were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because Defendants' failed to disclose that Micron was not ramping production and was anticipating a slowdown in demand. In addition, by affirmatively characterizing the supply-demand environment, Defendants had a duty to disclose the full truth, including that they were acting in anticipation of slowing, not healthy, demand.

182.    On October 4, 2024, Micron filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operating results for its fiscal fourth quarter and year ended August 29, 2024 (the "2024 10-K"). With respect to the purported overall recovery of demand for Micron's products, the 2024 10-K stated, in relevant part:

> Throughout 2024, we experienced substantial improvements in pricing and margins. *Increasing demand growth, driven in part by deployment of AI and mostly normal customer inventories, combined with industry-wide supply discipline, resulted in an industry supply and demand balance that substantially improved from 2023 conditions*. We executed well on pricing and improved our financial performance significantly from the start of the year. *We are exiting the year with excellent momentum and an industry-leading product portfolio*.

183.    The above statements were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because Defendants' failed to disclose that Micron was not ramping production and was anticipating a slowdown in demand. In addition, by affirmatively characterizing the supply-demand environment, Defendants had a duty to disclose the full truth, including that they were acting in anticipation of slowing, not healthy, demand.

**The Truth Emerges**

184.    As set forth above, in the months leading up to the announcement of Micron's earnings for the first quarter of fiscal year 2025, Defendants touted repeatedly touted the strength of the semiconductor market and the Company's ability to thrive in that market. These touts included, in June 2024, assurances that Micron was "***well positioned to deliver a substantial revenue record in fiscal 2025***," and "***trends will drive significant growth in the demand for DRAM and NAND***"; and, in September 2024, assurances that Micron was "***entering fiscal 2025 with the best competitive positioning in Micron's history***," "***expect[ing] a healthy industry supply-demand environment for NAND in calendar 2025***," "***look[ing] forward into the first quarter [with] things are coming together as we had hoped, tied at the leading edge,***" and "***exiting the year [FY2024] with excellent momentum and an industry-leading product*** portfolio."

185.    Investors thus were stunned on December 18, 2024, when, immediately after have predicted "***revenue record in fiscal 2025***" and described "***the best competitive positioning in Micron's history***"—and, not coincidentally, after enough time had passed after Mehrotra had lined his pockets with over $77 million in proceeds at investors' expense—Defendants finally disclosed what they had known all along: that semiconductor supply and demand were not aligned, Micron had been materially overstating its prospects, and the Company's  revenue predictions and descriptions of the market were materially misleading.

186.    On December 18, 2024, after the close of trading, Micron issued a press release announcing its financial results for the first quarter of its fiscal year 2025 (the "1Q25 Earnings Release"). At the same time, Micron issued its quarterly report for the first quarter of its fiscal year 2025 (the "1Q25 10Q").  Among other things, these disclosures revealed

that "Sales of NAND products decreased 5% primarily due to a low-single-digit percent range decrease in bit shipments and a low-single-digit percent range decrease in average selling prices," *i.e.*, decreased demand.

187.    Mehrotra then issued disappointing guidance for the second quarter of its fiscal year 2025, including adjusted earnings between $1.33 and $1.53 per share, well below the $1.92 per share estimate; sales between $7.7 billion and $8.1 billion, with the midpoint well below the $8.99 billion estimate; and adjusted gross margins between 37.5% and 39.5%, well below the 41.3% estimate. In addition, Defendant Mehrotra, as quoted in the 1Q25 Earnings Release, disclosed that "***consumer-oriented markets are weaker in the near term[.]***" This was the opposite of what Mehrotra had assured investors throughout the Relevant Period, including most recently in response to analyst questions on the Q324 and FY24 Calls.

188.    Also on December 18, 2024, on a call with investors to disclose the Company's first-quarter fiscal year 2025 financial performance ("Q125 Call"), Mehrotra elaborated on the factors that led to its disappointing revenue decline in NAND flash memory and disappointing guidance. In particular, Mehrotra revealed that, despite his prior assurances about the NAND market, supply and demand were not in alignment, and demand was slowing.

> Our outlook for industry NAND bit demand growth in both calendar 2024 and 2025 is now in the low-double-digits percentage range, which is lower than our prior expectations. ***Key drivers include slower growth in NAND content in consumer devices, ongoing inventory adjustments and demand dynamics in different end markets, as outlined earlier, and a temporary moderation in near-term data center SSD purchases by customers after several quarters of very rapid growth***.
>
> In data center, we remain enthusiastic about long-term demand growth as NAND is a key enabler for AI workloads, providing faster data access, lower power and better overall total cost of ownership essential for AI infrastructure. In the next few years, we also expect high-capacity NAND SSDs to start displacing capacity HDDs in the data center, an inflection that will drive long-term NAND demand

growth. ***The decline in 2024 and 2025 industry NAND demand growth outlook implies that supply actions will be necessary to achieve balance.***

189.    Incredibly, Mehrotra stated that the Company would need to produce fewer NAND chips, less than three months after he had touted to investors that Micron was "ramping production" to meet demand.

> As mentioned previously, since NAND technology transitions provide a significant increase in overall bit output, the pace of technology transitions will also need to slow in order to align supply to industry demand. Micron is decisively taking actions to align our NAND supply with industry demand trends. ***We have reduced NAND CapEx versus prior plan and have slowed the pace of technology node transitions***.
>
> In addition, ***we are reducing NAND wafer starts by a mid-teens percentage versus prior levels. These actions will align our supply to current market demand***.

190.    Mehrotra's disclosure of the need to reduce production was especially curious since they were entirely inconsistent with what the Company had said it was doing in September 2024 (*i.e.*, midway through 1Q25), and during the quarter the Company's inventory of raw materials, work in progress, and finished goods had not materially changed over the quarter and its inventory turnover and days in inventory had improved.

191.    Continuing on the Q125 Call, Mehrotra told attendees that:

> Consistent with analyst reports, ***we have seen an increase in bit supply at legacy technology nodes from a China-based DRAM and a China-based NAND supplier.*** In calendar 2024, analyst reports indicate that China-based supply will represent a mid-single-digit percentage of industry bit supply for DRAM and a high-single-digit percent of supply for NAND.
>
> Competition from China supply is focused on China market demand in DRAM with DDR4 and LP4 products and in NAND with consumer, client and lower performance mobile products. ***We expect Micron's worldwide revenue related to LP4 and D4 DRAM products for the remainder of fiscal 2025 to be approximately 10%.***

192.    The next day, multiple analysts lowered their price targets for Micron stock, citing the Company's disappointing guidance for the second quarter of its fiscal year 2025, while noting significant weakness in demand in its consumer markets, especially for its NAND products.

193.    For example, in reducing its price target from $135 to $125, UBS wrote that Micron's fiscal second quarter 2025 "[g]uidance was below even the most bearish bogeys . . . with the company citing ongoing malaise in consumer markets—especially PC—which is hurting the NAND business in particular."

194.    Similarly, in reducing its price target to $110 from $125 and downgrading Micron stock to a "Neutral" rating from a "Buy" rating, Bank of America wrote that "weakness in PC and phone markets are putting downward pressure on memory pricing, especially in NAND."

195.    Likewise, in reducing its price target to $98 from $114, Morgan Stanley, calling the announcement "surprising" wrote that "NAND weakness [had] take[n] its toll[,]" noting that "Micron guided revenue below expectations driven mostly by revenue decline in NAND[,]" that "NAND will drive most of the revenue decline in February, which implies a sequential decline of about 20% in revenue[,]" and that "Micron has very clearly decided that NAND is oversupplied, cutting capex, cutting back on wafer starts by about 15%, and preparing for a sustained period of weak demand."

196.    Analyst firm Susquehanna noted that "NAND revenue was approximately $2.2B during the Nov-Q, accounting for 26% of Micron's total revenue. NAND revenue declined -5% sequentially, with bit shipments down in the low-single digit percentage range and ASPs declining as well low single digits."

197.    Morningstar, lowering its fair value estimate to $100 from $110, stated that:

The firm's outlook for the February quarter implies a 9% sequential decline in revenue, with management citing weakness in PC and mobile phone demand.

Why it matters: Micron's outlook was more than 10% below our expectations. We now expect significantly weaker NAND revenue for Micron in fiscal 2025, as the firm's NAND chip sales are more exposed to PC and mobile phone shipments. We also expect this to weigh on gross margin. We expect lower medium-term NAND results as well, with management announcing plans to cut its capital investment in NAND production and to reduce utilization at its existing factories. We don't see a near-term upward inflection for PC and smartphone demand. Positively, management raised its expectations for high-bandwidth memory growth over the next five years. We expect better DRAM and HBM shipments into data centers to partially offset our weaker NAND forecast.

198.    Morningstar went on to state that "We are skeptical of a snapback in revenue after the February quarter, given that we expect increasing pricing pressure for both DRAM and NAND."

199.    Following the 1Q25 Earnings Release and reduced-price targets issued by analysts for Micron stock, the Company's stock price fell $16.81 per share, or 16.18%, to close at $87.09 per share on December 19, 2024.

200.    The disclosures in the 1Q25 Earnings Release both corrected the market's misimpression Micron's business operations, which had been inflated by Defendants' misrepresentations, and constituted a materialization of the concealed risk that when the market learned the truth about the Company's prospects, the stock price would plummet.

201.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common stock, the Company has suffered damages.

**Defendant Mehrotra's Illicit Insider Sales**

202.    Prior to the Relevant Period, Mehrotra had only sold Micron stock on a single occasion, selling 100,000 shares of stock on January 14, 2022 for total proceeds of $971,600.

203.    At the start of the Relevant Period, Mehrotra held 1,383,566 shares of Micron stock. On May 15, 2023, after he began touting Micron's strong prospects in 2024 and 2025, Mehrotra adopted a 10b5-1 plan to automatically, and aggressively, liquidate Mehrotra's holdings in Micron beginning in August 2023 and continuing throughout the Relevant Period. In total, Mehrotra converted options for 799,284 shares of common stock and sold those shares for total proceeds of $77,471,537.52. Mehrotra's decision to begin selling shares at this time seemed peculiar, as TrendForce had just predicted that Micron's operating margins would "remain in the red."[23]

| Date | Sale Price | Quantity | Proceeds |
|---|---|---|---|
| 8/14/2023 | $67.24 | 37,000 | $2,487,880.00 |
| 8/22/2023 | $63.93 | 7,000 | $447,510.00 |
| 8/29/2023 | $69.29 | 37,000 | $2,563,730.00 |
| 9/6/2023 | $70.11 | 7,000 | $490,770.00 |
| 9/12/2023 | $71.15 | 7,000 | $498,050.00 |
| 9/19/2023 | $70.39 | 7,000 | $492,730.00 |
| 9/26/2023 | $68.30 | 7,000 | $478,100.00 |
| 10/3/2023 | $68.19 | 7,000 | $477,330.00 |
| 10/10/2023 | $69.54 | 7,000 | $486,780.00 |
| 10/17/2023 | $69.00 | 7,000 | $483,000.00 |
| 10/24/2023 | $67.54 | 7,000 | $472,780.00 |
| 10/31/2023 | $66.13 | 7,000 | $462,910.00 |
| 11/7/2023 | $72.66 | 7,000 | $508,620.00 |
| 11/14/2023 | $76.94 | 22,000 | $1,692,680.00 |
| 11/21/2023 | $76.73 | 7,000 | $537,110.00 |
| 11/28/2023 | $75.07 | 7,000 | $525,490.00 |
| 12/5/2023 | $73.55 | 7,000 | $514,850.00 |
| 12/12/2023 | $79.88 | 134,000 | $10,703,920.00 |
| 12/19/2023 | $81.61 | 7,000 | $571,270.00 |
| 12/27/2023 | $86.52 | 7,000 | $605,640.00 |
| 1/3/2024 | $82.13 | 7,000 | $574,910.00 |
| 1/9/2024 | $83.63 | 7,000 | $585,410.00 |
| 1/17/2024 | $83.20 | 7,000 | $582,400.00 |

[23] Press Release, *DRAM Industry Q1 Revenues Decline 21.2% QoQ, Marking Third Consecutive Quarter of Downturn, Says TrendForce*, TrendForce, May 25, 2023, https://www.trendforce.com/presscenter/news/20230525-11688.html.

| 1/23/2024 | $87.41 | 7,000 | $611,870.00 |
| 1/25/2024 | $90.00 | 45,000 | $4,050,000.00 |
| 1/30/2024 | $87.02 | 7,000 | $609,140.00 |
| 2/6/2024 | $84.84 | 7,000 | $593,880.00 |
| 2/13/2024 | $82.03 | 7,000 | $574,210.00 |
| 2/21/2024 | $80.44 | 7,000 | $563,080.00 |
| 2/27/2024 | $91.54 | 7,000 | $640,780.00 |
| 3/5/2024 | $94.26 | 7,000 | $659,820.00 |
| 3/8/2024 | $99.41 | 52,000 | $5,169,320.00 |
| 3/19/2024 | $110.65 | 52,000 | $5,753,800.00 |
| 3/25/2024 | $119.99 | 52,000 | $6,239,480.00 |
| 4/2/2024 | $128.94 | 52,000 | $6,704,880.00 |
| 4/9/2024 | $122.60 | 7,000 | $858,200.00 |
| 4/16/2024 | $120.70 | 7,000 | $844,900.00 |
| 4/23/2024 | $111.93 | 7,000 | $783,510.00 |
| 4/30/2024 | $114.87 | 7,000 | $804,090.00 |
| 5/7/2024 | $120.32 | 7,000 | $842,240.00 |
| 5/14/2024 | $122.89 | 7,000 | $860,230.00 |
| 5/21/2024 | $127.66 | 7,000 | $893,620.00 |
| 5/29/2024 | $132.14 | 7,000 | $924,980.00 |
| 6/4/2024 | $126.14 | 7,000 | $882,980.00 |
| 6/11/2024 | $138.97 | 37,000 | $5,141,890.00 |
| 6/18/2024 | $152.28 | 34,284 | $5,220,767.52 |
| **Total** | | 799,284 | $77,471,537.52 |

204.    Indeed, Mehrotra increased his share sales as the Company's share price became inflated by the misstatements alleged herein. In fact, Mehrotra made several of the largest sales – 279,284 shares in total (representing 17% of his total holdings) – as the stock was at or near its peak.

205.    Tellingly, despite the fact that Mehrotra repeatedly touted 2025 as a record year for Micron and the semiconductor industry as a whole, according to form 4s filed during the Relevant Period, Mehrotra sold his shares immediately upon exercise pursuant to the instructions in his 10b5-1 trading plan. This indicates that Mehrotra structured his 10b5-1 plan to liquidate all his shares be liquidated in 2024 immediately upon option exercise, *i.e.*, to sell as much as possible while the share price was inflated. Indeed, since the end of the Relevant Period, after the

truth emerged and investors learned the truth, Mehrotra has made a single trade of 7,500 shares for $784,986 in February 2025.

206.    According to Micron's proxy statement filed December 2, 2022, as of November 14, 2022, Mehrotra owned 1,184,119 shares of common stock and the right to acquire 612,284 additional shares through exercise of option for a total beneficial ownership of 1,796,403 shares of common stock. According to Micron's proxy statement filed November 26, 2024, as of November 28, 2024, Mehrotra owned 1,278,674, of which 271,679 were restricted and ineligible for sale, amounting to 1,006,995 shares eligible for sale. In all, Mehrotra reduced his unrestricted holdings in Micron stock and exercisable options during the Relevant Period by 43.9%.[24]

207.    On December 18, 2024, after the close of trading, Micron issued a press release announcing its financial results for the first quarter of its fiscal year 2025 (the "1Q25 Earnings Release"). At the same time, Micron issued its quarterly report for the first quarter of its fiscal year 2025 (the "1Q25 10Q"). Among other items, the Company stated that "Sales of NAND products decreased 5% primarily due to a low-single-digit percent range decrease in bit shipments and a low-single-digit percent range decrease in average selling prices," and issued disappointing guidance for the second quarter of its fiscal year 2025, including adjusted earnings between $1.33 and $1.53 per share, well below the $1.92 per share estimate; sales between $7.7 billion and $8.1 billion, with the midpoint well below the $8.99 billion estimate; and adjusted gross margins between 37.5% and 39.5%, well below the 41.3% estimate. In addition, Defendant Mehrotra, as quoted in the 1Q25 Earnings Release, disclosed that "consumer-oriented markets are weaker in the near term[.]" On an earnings call that same day, Mehrotra further attributed the

---

[24] The lack of Form 4s filed between November 14, 2022 and the start of the Relevant Period, and between November 26, 2024 and the end of the Relevant Period indicates that the numbers represented in the two proxy statements reflects Mehrotra's holdings at the start and the end of the Relevant Period, respectively.

disappointing results to "slower growth in NAND content in consumer devices, ongoing inventory adjustments and demand dynamics in different end markets, as outlined earlier, and a temporary moderation in near-term data center SSD purchases by customers after several quarters of very rapid growth." Mehrotra also stated that "[c]onsistent with analyst reports, we have seen an increase in bit supply at legacy technology nodes from a China-based DRAM and a China-based NAND supplier. In calendar 2024, analyst reports indicate that China-based supply will represent a mid-single-digit percentage of industry bit supply for DRAM and a high-single-digit percent of supply for NAND."

208.    Yet, despite the fact that Defendants claimed that the weakness of demand and excess of supply in the NAND market was a surprise to investors, Micron's financial results showed none of the tell-tale signs of a shock to the market. For example, Micron did not need to write down any inventories because of lower prices. In addition, Mehrotra's comments revealed that, in assessing supply in the NAND market, Mehrotra did not take into account the "China-based NAND supplier"—YMTC—despite the fact that it was well known to Micron for years that YMTC had a significant market share and financial backing from the Chinese government and was ramping up production throughout the Relevant Period.

209.    In addition, given the extensive lead time to develop DRAM and NAND semiconductors, Micron needed to increase its inventories of raw materials, work in progress, and finished goods. Indeed, on an earnings call with analysts and investors on September 25, 2024, to announce the Company's results for the fourth quarter and full year of fiscal 2024 ("FY2024 Call"), Mehrotra touted to investors that "Micron is ramping production of the industry's most advanced technology nodes in both DRAM and NAND." Accordingly, if the Company was anticipating increased sales and was "ramping production," the Company's

inventories would need to materially increase. In addition, if demand proved to be less than anticipated, Micron's inventories would swell.

210.    Micron's inventories, however, did not meaningfully increase. Indeed, between August 29, 2024 and November 28, 2024, during which time Mehrotra advised investors that the Company was "ramping production," Micron's inventories declined. In other words, when Defendants lowered expectations because of unexpected declines in demand, the Company's inventory situation improved. This is the exact opposite outcome of what should have occurred if the Company was caught unawares when demand had failed to materialize.

211.    This inconsistency was reflected when calculating the Company's inventory ratios as well. Specifically, as reflected in the chart below, Micron's inventory turnover and days in inventory ratios experienced no material changes from the first quarter of fiscal year 2024 to the first quarter of fiscal year 2025, even though Defendants were experiencing what they described as unexpected demand declines.



212.    This conclusion is reinforced by the following chart, which show Micron's inventory turnover and days in inventory ratios on a quarterly basis (*i.e.*, for the prior 90 days).



213.    On a quarterly basis, the Company's inventory turnover ratio increased and its days in inventory decrease, *i.e.*, both indicators improved. The exact opposite of what would be expected, particularly in comparison to Q1FY23, if the Company had been surprised by a decline in demand.

214.    After reviewing this data, Plaintiffs' expert, Mr. Zaydenverg agreed with these conclusions and opined that "Based on a long production cycle, Micron's inventory levels and ratios from the end of fiscal 2024 (*i.e.*, August 29, 2024) through the end of the first quarter of fiscal 2025 (*i.e.*, November 28, 2024), are not consistent with the expectation of a significant rise in revenue in the immediate future." In other words, the data show that Micron was acting as if it was expecting a demand slowdown, not that it was surprised by a demand slowdown.

215.    In reality, Defendants had known all along that there was no increase in demand on the horizon, had not "ramped" production and instead had touted the future to prop up the Company's share price so that Mehrotra could reap tens of millions of profits in ill-gotten gains.

## DAMAGES TO THE COMPANY

216.    Micron has been, and will continue to be, severely damaged and injured by the Defendants' misconduct.  As a direct and proximate result of the Defendants' conduct, Micron has been seriously harmed and will continue to be.  Such harm includes, but is not limited to:

a.   costs incurred in compensation and benefits paid to Defendants that violated federal securities laws;

b.   substantial loss of market capital;

c.   costs already incurred and to be incurred defending the pending Related Securities Action; and

d.   any fines or other liability resulting from the Company's violations of federal law.

217.    In addition, Micron's business, goodwill and reputation with its business partners, regulators and shareholders have been gravely impaired.  The credibility and motives of management are now in serious doubt.

218.    The wrongdoing complained of herein has irreparably damaged Micron's corporate image and goodwill.  For at least the foreseeable future, Micron will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Micron's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

219.    Plaintiff brings this action derivatively in the right and for the benefit of Micron to redress injuries suffered, and to be suffered, by Micron as a direct result of violations of federal securities laws by the Defendants.   Micron is named as a Nominal Defendant solely in a derivative capacity.   This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

220.    The Board of Micron, at the time this action was commenced, consisted of Defendants Mehrotra, Dugle, Beyer, Gomo, Haynesworth, McCarthy, Swan, Wright, and Related Party Non-Defendants Simons and Liu, a total of thirteen (10) individuals.

221.    Plaintiff has not made any demand on the Board to institute this action because a pre-suit demand on the Micron Board would be futile, and therefore, excused.   This is because a majority of the Board faces a substantial likelihood of liability as a result of their scheme and false and misleading statements and/or omissions of material adverse facts which render them unable to impartially consider a demand to pursue the wrongdoing alleged herein.

222.    Each of the Director Defendants were responsible for reviewing and approving the Company's public statements made in press releases and financial filings with the SEC throughout the Relevant Period. By authorizing the false and misleading statements and material omissions and described above during the Relevant Period concerning the Company's business and prospects, each of the Director Defendants knowingly faces a substantial likelihood of liability for their participation in the illicit acts alleged herein.

223.    Upon information and belief, in their capacity as members of the Company's Board, the Director Defendants were privy to specific information related to the Company's business and financial prospects, which would reasonably put them on notice that the statements they were making were in fact false and misleading.

**Demand is Futile as to Defendant Mehrotra Because His
Principal Professional Occupation as the Company's CEO**

224. Defendant Mehrotra has been the Company's CEO, President, and member of the Board of Directors (the "Board") since June 2017. Defendant Mehrotra has been the Chair of the Board since January 16, 2024. The Company does not claim that Defendant Mehrotra is an independent director and because his primary source of income and primary employment is his employment as CEO of Micron and his professional reputation is inextricably bound to his role at Micron, Defendant Mehrotra is incapable of acting independently and demand is futile upon him.

225. In addition, demand upon Defendant Mehrotra would be a futile and useless act as he directly benefited from the wrongs and acts complained of herein and faces a sufficiently substantial likelihood of liability in connection with his insider illicit stock sales detailed above, and cannot possibly consider a demand to sue himself based on those transactions in which he reaped significant benefits.

226. Defendant Mehrotra made such illicit trades during the Relevant Period by wrongfully benefiting from the Company's artificially inflated stock price at the expense of the Company's shareholders. Throughout the Relevant Period, Defendants misled the investing public regarding the true business prospects of the Company. When the truth finally emerged, the Company's stock plummeted, but only after Defendant Mehrotra had substantially benefited by selling significant portions of his stock at the higher prices.

227. The Company has adopted an Insider Trading Policy (the "Insider Policy") to provide guidance with respect to the trading of the Company's securities. The Insider Policy provides that all persons covered under the policy cannot trade while in possession of inside information, including officers and directors of the Company.

228.    As a result, Defendant Mehrotra violated the Company's Insider Policy and faces a sufficiently substantial likelihood of liability due to his illicit trades, rendering him interested in considering demand.

### Demand is Futile as to the Audit Committee Defendants

229.    Demand is futile as to Defendants McCarthy, Gomo, Haynesworth, and Swan (the "Audit Committee Defendants") as members of the Audit Committee for their knowing failure to fulfill their responsibilities.

230.    The Board of Directors adopted an Audit Committee Charter, setting forth the responsibilities of the Audit Committee.  The duties of the Audit Committee are set forth herein, *supra*.

231.    Upon information and belief, in their capacity as members of the Audit Committee, the Audit Committee Defendants were privy to specific information related to the Company's business, operations, and prospects, which would reasonably put them on notice that the statements set forth above in the Company's public filings were materially false and misleading when made.

232.    The Company's public filings concerning the Company's business and prospects during the Relevant Period contained materially misleading information and/or omitted material information concerning the failure of the Company's channel management initiatives, the Company's decision not to compete on pricing, and the resulting inflated inventory in the LATAM, Canada, and Eastern European markets.  In their capacity as members of the Audit Committee, the Audit Committee Defendants were charged with ensuring that these reports did not contain such materially misleading information.  By allowing documents to be filled with misleading information, the Audit Committee Defendants face a sufficiently significant

likelihood of liability so as to render them interested.  Accordingly, the Audit Committee Defendants cannot adequately independently consider a demand.

**Demand is Futile as to the Director Defendants**

233.    Plaintiff has not made any demand on the Board to institute this action because a pre-suit demand on the Company's Board would be futile, and therefore, excused.  This is because a majority of the Board faces a substantial likelihood of liability as a result of their knowing toleration of the above described false and misleading statements and omissions of material adverse facts, which render them unable to impartially consider a demand to pursue the wrongdoing alleged herein.

234.    Upon information and belief, in their capacity as members of the Company's Board, the Director Defendants were privy to specific information related to the Company's business and financial prospects, which would reasonably put them on notice that the statements they were making were in fact false and misleading.

235.    Each of the Director Defendants were responsible for reviewing and approving the Company's public statements made in press releases and financial filings with the SEC throughout the Relevant Period.  By authorizing the false and misleading statements and material omissions and described above during the Relevant Period concerning the Company's business and prospects, each of the Director Defendants knowingly faces a substantial likelihood of liability for their participation in the illicit acts alleged herein.

236.    Lastly, as set forth in further detail above, the Company maintains the Code, the Director Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to cause the Company to issue materially false and misleading statements to the public, as alleged herein. In violation of the Code, the Director Defendants

failed to maintain the accuracy of Company records; protect and ensure the efficient use of Company assets; comply with all applicable laws, rules, and regulations; and properly report violations of the Code and applicable laws, rules, and regulations.

237.    Accordingly, the Director Defendants face a sufficiently substantial likelihood of liability such as to create a reasonable doubt as to their impartially consider a demand to sue themselves in the present action.

## COUNT I

### Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act

238.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

239.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

240.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

241.    Under the direction and watch of the Individual Defendants, the 2023 Proxy Statement failed to disclose to the investors that demand for the Company's NAND products was declining and that the Company faced increased competition from its competitor YMTC.

242.    The 2023 Proxy Statement was also materially misleading because the facts show that the Board and its committees utterly failed to implement controls to effectively oversee conduct risk relating to the Company's core business, operation and prospects in relation to the conduct alleged herein.

243.    The Individual Defendants knew or recklessly disregarded that by misrepresenting of failing to disclose the foregoing material facts, the statements contained in the 2023 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to shareholders in voting on the matters set forth for shareholder determination in the 2023 Proxy Statement, including but not limited to, the re-election of the Company's directors.

244.    The Company was damaged as a result of the Individual Defendants' material misrepresentations in the 2023 Proxy Statement.

245.    Plaintiff, on behalf of Micron has no adequate remedy at law.

### COUNT II

**Against the Securities Action Defendants**
**for Contribution Under Section 10(b) of the Exchange Act,**
**<u>Rule 10b-5 Promulgated Thereunder, and/or Section 20(a) of the Exchange Act</u>**

246.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

247.    As a result of the conduct and events alleged above, Micron has been named as a defendant in the Related Securities Action brought on behalf of Micron shareholders in which it

is a joint tortfeasor in claims brought under Section 10(b) of the Securities and Exchange Act and Rule 10(b)-5 promulgated thereunder.

248.    Federal law provides Micron with a cause of action against other alleged joint tortfeasors under Rule 10b-5. In particular under the Supreme Court's decision in *Musick, Peeler & Garrett v. Employers Insurance of Wausau*, 508 U. S. 286, Micron has a federal law right to contribution against joint tortfeasors under Rule 10b-5. Section 21D(f) of the Securities and Exchange Act further sets forth specific provisions entitling Micron to contribution against all joint tortfeasors under Rule 10b-5, regardless of whether they have been named as defendants in the currently pending Related Securities Action and sets forth specific rules regarding the determination of claims for such contribution.

249.    Accordingly, Plaintiff, on behalf of Micron, hereby claims contribution against the Securities Action Defendants, each of whom has been named in the currently pending Related Securities Action as a joint tortfeasor with Micron under Rule 10b-5, or if joined in such actions, would be liable for the same damage as Micron.

**Allegations Regarding Securities Action Defendants**

250.    Throughout the Relevant Period, the Securities Action Defendants caused the Company to issue false and misleading statements and/or omit material information in public statements and/or Company filings concerning the Company's business and financial prospects. These statements were materially misleading to persons who purchased Micron securities during the Relevant Period.

251.    The plaintiffs in the Related Securities Action allege that they relied, directly or indirectly, upon these false statements and misleadingly omissive disclosures in purchasing Micron securities, and, as a result, suffered damages because the value of their investments was

distorted by the false and materially omissive statements, and they purchased securities at such distorted prices.

252.    The damages suffered by said investors were caused by reason of the fact that (i) they were induced to purchase said securities by the false and misleading statements alleged herein, and (ii) the reveal of the true nature of the Company's business and prospects resulted in the decrease in price of its securities, causing the value of shareholder's investments to drop.

253.    The Plaintiffs in the Related Securities Action were unaware of the false and misleading nature of said statements and omissive disclosures.

254.    When the Securities Action Defendants signed off on or made the false and omissive disclosures detailed herein, they had actual knowledge that they were false and misleading. As alleged herein, due to their positions as employees and/or directors of Micron, the Securities Action Defendants were privy to information regarding the Company's business and financial prospects and would have been aware that the statements were in fact false and misleading when made.

255.    Accordingly, the Securities Action Defendants are liable for damages under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and, if Micron were to be held liable in the Related Securities Action, the Securities Action Defendants would be liable to it for contribution. Plaintiffs hereby derivatively claim such right of contribution on behalf of Micron.

**Allegations Regarding the Securities Action Defendants as Control Persons**

256.    In acting as alleged above, the Securities Action Defendants were acting as authorized agents of Micron in their roles as directors and/or employees. Because of their positions of control and authority as senior officers and/or directors, the Securities Action

Defendants were able to, and did, control the contents of various reports, press releases, and public filings disseminated by the Company throughout the Relevant Period, as alleged herein.

257.    The Securities Action Defendants were "controlling persons" of Micron within the meaning of Section 20(a) of the Exchange Act, and accordingly, the Securities Action Defendants could be held liable to the plaintiffs in the Related Securities Action. Were the Company to be held liable in the Related Securities Action, the Securities Action Defendants would be liable to it for contribution.

258.    Plaintiff hereby derivatively claims such right on behalf of Micron.

**COUNT III**

**<u>Against the Individual Defendants for Breaches of Fiduciary Duty</u>**

259.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

260.    The Individual Defendants owed and owe Micron fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe Micron the highest obligation of good faith, loyalty, and due care.

261.    The Individual Defendants have violated and breached their fiduciary duties of good faith, loyalty, and due care by causing or allowing the Company to disseminate to Micron shareholders materially misleading and inaccurate information through the Company's SEC filings throughout the Relevant Period.  These actions could not have been a good faith exercise of prudent business judgment.

262.    During the course of the discharge of their duties, the Individual Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet the Individual Defendants caused Micron to engage in the conduct complained of herein which

they knew had an unreasonable risk of damage to the Company, thus breaching their duties owed to Micron and its shareholders.  As a result, the Individual Defendants grossly mismanaged the Company.

263.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

264.    Plaintiff, on behalf of Micron, has no adequate remedy at law.

## COUNT IV

### Against all the Individual Defendants for Unjust Enrichment

265.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

266.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Micron.

267.    The Individual Defendants were unjustly enriched as a result of the compensation they received while breaching their fiduciary duties owed to Micron.

268.    Plaintiff, as a shareholder and representative of Micron, seeks restitution from the Individual Defendants and seek an order from this Court disgorging all profits, benefits, and other compensation obtained by the Individual Defendants from their wrongful conduct and breaches of fiduciary duty.

269.    Plaintiff, on behalf of Micron, has no adequate remedy at law.

## COUNT V

### Against the Individual Defendants for Abuse of Control

270.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

271.    The Individual Defendants have taken advantage of their positions as officers and/or directors of the Company to the detriment of Micron and the investing public by causing the Company to issue materially misleading statements and/or omitting material information concerning the reporting of the Company's financials and lack of related internal control.

272.    As such, the Individual Defendants have abused their positions of control with the Company and are legally responsible.

273.    Thus, for the aforementioned reasons, the Individual Defendants are liable to the Company for their wrongdoing.

## COUNT VI

## Against the Individual Defendants for Gross Mismanagement

274.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

275.    The Individual Defendants owed a duty of oversight to the Company in which they were responsible to ensure that the Company maintained adequate reporting controls for all financial, accounting and disclosure released by the Company.  Furthermore, the Defendants were responsible to oversee, manage and control the operations of the Company, including the manners and methods of reporting in which the acts complained herein occurred.

276.    Through the wrongful acts complained of herein, the Individual Defendants refused or did not properly discharge their responsibilities to the Company and its shareholders in a prudent manner as prescribed by law as well as in the Company's corporate governance regulations.

277.    By committing the misconduct alleged herein, the Individual Defendants breached their fiduciary duties of due care, diligence and candor in the management and administration of Micron's affairs and in the use and preservation of Micron's assets.

278.    During the course of the discharge of their duties, the Individual Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet the Individual Defendants caused Micron to engage in the conduct complained of herein which they knew had an unreasonable risk of damage to Micron, thus breaching their duties to the Company.

279.    As a result, the Individual Defendants grossly mismanaged Micron and should be liable to the Company for the resulting damages.

## COUNT VII

### Against the Individual Defendants for Waste of Corporate Assets

280.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

281.    As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions (as evidenced, for example, by the Related Securities Action), to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

282.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

283.    Plaintiff, on behalf of Micron, has no adequate remedy at law.

## COUNT VIII

### Against the Defendant Mehrotra for Breach
### of Fiduciary Duty for Insider Selling and Misappropriation of Information

284.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

285.    The Defendant Mehrotra, throughout the Relevant Period, engaged in the sale of Company stock at artificially inflated prices while in possession of material information that had yet to be released to the investing public. Defendant Mehrotra engaged in this course of conduct to keep the public unaware of the adverse information affecting the Company's stock price and benefited to the detriment of the investing public and the Company itself.

286.    This proprietary, non-public information concerning the Company's business and prospects was known by Defendant Mehrotra, who sold substantial amounts of his shares of Company stock during the period that the Defendant's fraud was ongoing. These sales were made for Defendant Mehrotra's own self-interests, at the expense of the Company and the investing public.

287.    By selling the Company's common stock while in possession of this information and failing to fully inform the investing public, Defendant Mehrotra breached his fiduciary duties of good faith and loyalty to the Company.

288.    As such, Defendant Mehrotra is legally responsible to the Company for the significant profits received from his sales of stock in Micron.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment in the Company's favor against all Defendants as follows:

A.    Declaring that Plaintiff may maintain this action on behalf of Micron and that Plaintiff is an adequate representative of the Company;

B.    Determining and awarding to Micron the damages sustained by it as a

result of the violations set forth above from each of the Defendants, jointly and severally, together with interest thereon;

C.      Directing Micron and the Director Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Micron and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's By-Laws or Articles of Incorporation; and the following actions as may be necessary to ensure proper Corporate Governance Policies:

(1) a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board; and

(2) a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

D.      Determining and awarding to Micron exemplary damages in an amount necessary to punish Defendants and to make an example of Defendants to the community according to proof at trial;

E.      Awarding Micron restitution from Defendants, and each of them;

F.      Awarding Micron contribution from the Securities Action Defendants, and each of them;

G.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

H.      Granting such other and further equitable relief as this Court may deem

just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: September 8, 2025

Respectfully submitted,

*/s/ Ryan M. Ernst*
**BIELLI & KLAUDER, LLC**
Ryan M. Ernst, Esq. (No. 4788)
1204 N. King Street
Wilmington, DE 19801
Main: (302) 803-4600
Direct: (302) 321-5411
rernst@bk-legal.com

*Attorneys for Plaintiff*

**LIFSHITZ LAW PLLC**
Joshua M. Lifshitz
1190 Broadway
Hewlett, NY 11557
Telephone: (516) 493-9780
Facsimile: (516) 280-7376
jlifshitz@lifshitzlaw.com